LODGE 743, INTERNATIONAL ASSO-
CIATION OF MACHINISTS, AFL-
CIO, Plaintiff,

v.

UNITED AIRCRAFT CORPORATION,
Defendant.

LODGE 1746, INTERNATIONAL ASSO-
CIATION OF MACHINISTS, AFL-
CIO, Plaintiff,

v.

UNITED AIRCRAFT CORPORATION,
Defendant.

Civ. A. Nos. 9084, 9085.

United States District Court
D. Connecticut.

March 20, 1969.

Addendum May 27, 1969.

Plato E. Papps, Mozart G. Ratner, Washington, D. C., William S. Zeman, Hartford, Conn., for plaintiffs; Stephen D. Gordon, Washington, D. C., of counsel.

Joseph C. Wells, Washington, D. C., S. Robert Jelley, Wiggin & Dana, New Haven, Conn., for defendants; Frank E. Callahan (Deceased), Wiggin & Dana, New Haven, Conn., Donald R. Holley, Miami, Fla., of counsel.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

The plaintiff unions commenced separate actions in this Court on December 11, 1961, pursuant to § 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C. § 185; thereafter on July 22, 1963, by consent of the parties, these suits were consolidated for trial. The plaintiffs seek a declaratory judgment that the Pratt & Whitney Aircraft Division and the Hamilton Standard Division, both subsidiaries of the defendant parent corporation, breached the terms of the Strike Settlement Agreements made in August 1960. They seek an order for specific performance and a judgment for substantial monetary damages. The unions' claims include remedial damages to the individual union members affected, institutional damages to the plaintiff unions, and punitive damages to deter the defendant from future unlawful conduct; in addition thereto, the plaintiffs request an allowance sufficient to pay counsel fees and the expenses of this litigation.

The original complaints contained a single count and alleged a breach of the Strike Settlement Agreements. Subsequently a consolidated amended complaint, drawn in four separate counts, was filed on November 30, 1964. The first count alleges that the defendant failed to reinstate strikers in accordance with the terms of the Strike Settlement Agreements, and that its conduct was motivated by a desire to protect those employees who helped break the strike. The unions represent that the defendant's strike period hirings, promotions, and transfers were not permanent replacements of strikers and that since the execution of the agreements in August 1960, the unions' membership has been unlawfully deprived of its employment. The second count, in addition to reiterating the averments of the first count, claims that the strikers were entitled to reinstatement as a matter of law, because the strike was caused or prolonged by the

defendant's unfair labor practices. The third count incorporated the material allegations of the first count and further asserted that the defendant contrived to curtail its employee complement immediately after the strike and during the effective period of the "preferred hiring list," in order to deprive those strikers who were awaiting recall from the full enjoyment of their employment and seniority rights. The fourth and final count, in addition to reasserting the allegations of the prior counts, represents that the defendant unlawfully deprived and prevented the plaintiffs from effectively policing and enforcing the defendant's compliance with the Strike Settlement Agreements. Upon defendant's motion, count two and paragraph 19(c) of count four (which alleged unfair labor practices on the part of the defendant in failing to furnish records dating back to 1953) were dismissed by order of the Court on June 16, 1965, because the subject matter alleged and the remedies sought were not within the jurisdiction of this Court.[1]

The plaintiff unions and the defendant employer have polarized their respective positions, so that the Court is asked to draw widely dissimilar conclusions from the facts presented in evidence. The plaintiffs have attempted to demonstrate that the defendant corporation deliberately designed and developed a "master plan" to minimize the number of registered strikers who would be rehired and to relegate to inferior jobs many strikers who were recalled, so that the union membership would be taught a lesson, thereby weakening the local unions and minimizing their organizational effectiveness.

Demonstrative of the existence of such a plan and the defendant's anti-union animus generally, they point to certain threats attributed to defendant's repre-

sentatives on the occasion of the local union leaders' refusal to recommend the terms of a tentative settlement negotiated and recommended by the plaintiffs' general counsel on or about July 7, 1960. At that time the defendant's Vice-President Burke is reported to have said "We are going to get you. We are going on a full scale hiring program;" and in similar vein the defendant's counsel purportedly admonished his adversary with the warning, "We're going to see to it that there isn't another strike at United Aircraft for fifteen (15) years." (DX–74).[2] While the statements standing alone express an attitude of measured hostility, when considered in the light of the circumstances in which they were said, they have the appearance of being the normal aftermath of heated and frustrated negotiations, which terminated in the aborting of an otherwise prospective peaceful labor relations settlement.

From the opposite end of the spectrum, the defendant-company points to the admissions by plaintiffs' general counsel, that these strikes at defendant's plants were ill-conceived by local union leadership at the outset and had already been lost, when he first arrived on the scene to negotiate. (Tr. 8920). He denied any recollection of a 1961 conversation, wherein defendant's counsel inquired of him why he had started this mammoth litigation, knowing there had been no violation and his giving a reply that the union was dead and he had to do something. (Tr. 9001). However, when asked if he told defendant's counsel, that he had hired plaintiffs' present trial counsel for the sole purpose of coming to Connecticut and litigating these suits, just as a means of keeping the union alive, he replied, "I could have said that." (Tr. 9006). If this were true, such a statement would strongly suggest a completely unjustifiable and unethical motive for

---

1. Lodge 1746 and Lodge 743, IAM v. United Aircraft Corp., Civil No. 9084 and No. 9085 (D.Conn., filed June 16, 1965).

2. In this Opinion the following abbreviations will be used in reference to the basic trial record:
 DX– Defendant's Exhibit
 PX– Plaintiffs' Exhibit
 Tr. Transcript of the trial

the plaintiffs initiating this protracted litigation.

Mindful of the philosophic and descriptive warning of the essayist, that "all looks yellow to the jaundiced eye," the Court, aloof from the natural emotional involvement of the parties, will not attempt to filter the motives, the alleged animus, or subjective suspicions of either of the litigants through any amber or rose-colored prism; but rather it will attempt to bring the conduct of both parties into focus, in the light of every day human experience and the tests of objective reality. In so doing, the Court will ascertain the true legal measure of their conduct in faithfully carrying out their respective obligations under the Strike Settlement Agreements.

## GENERAL FACTUAL BACKGROUND

Local Lodges #1746 and #743 are both labor unions within the meaning of § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and are affiliated with the International Association of Machinists. For many years Lodge #1746 had been the exclusive bargaining agent for the employees in the East Hartford and Manchester plants of the Pratt & Whitney Aircraft Division and prior to the strike had approximately 6,500 members (Tr. 1547); and Lodge #743 had similarly been the lawful bargaining agent for the employees in the Windsor Locks and Broad Brook plants of the Hamilton Standard Division. (Tr. 3254).

Pratt & Whitney, the largest of the defendant's subsidiaries, is primarily engaged in the production of multiple types of jet engines for aircraft, utilities, ships industrial and transportation installations, as well as rocket engines for spacecraft. Its principal plants in Connecticut are located in East Hartford, Manchester, North Haven, Southington, Middletown and Meriden. At the time of this labor dispute in 1960, the East Hartford and Manchester plants, represented by Lodge #1746, employed between 15,-000 and 16,000 hourly paid employees; however, it should be noted that the Manchester plant had only 140 employees, and each plant was treated by the parties as a separate entity for purposes of collective bargaining. The labor contracts in both units expired December 4, 1959.

Hamilton Standard's main plant at Windsor Locks employed approximately 5,000; the Broad Brook plant employed only 400. The larger factory manufactured airplane propellers, fuel controls for jet engines, aircraft air conditioning systems, electronic components, controls and related items. The smaller plant produced and assembled electronic devices exclusively. Separate labor contracts for these two plants existed with Lodge #743.

As a prelude to the strike, during the period 1959–1960, a Union Unity Program was initiated on a national level between the International Association of Machinists representing the employees at the defendant's East Hartford, Manchester, Southington, Meriden and Middletown plants with representatives of the United Automobile Workers' Union, which represented employees in the defendant's North Haven and Stratford (Sikorsky) plants. (Tr. 2953-4). The bargaining committees and membership in the Southington, Meriden, and Middletown plants subsequently negotiated and ratified a three (3) year agreement on December 4, 1959, but the membership of Lodge #1746 refused to approve it. The Hamilton contract expired April 21, 1960; the Sikorsky contract in February 1960; the North Haven plant, May 15, 1960. The latter unions announced uniform objections and advanced a common strike date. (Tr. 2963–68). The primary issues were: (1) a union shop; (2) plant-wide seniority; (3) automatic wage progression; (4) promotions on the basis of strict seniority; and (5) unrestricted arbitration. (Tr. 2969). It is not relevant or significant to consider here the factors which led to the settlement of the disputes in the other plants; for our purpose, only Pratt & Whitney Lodge #1746

and Hamilton Lodge #743 are the subject matter of this litigation.

The plaintiffs commenced their strike against both Pratt & Whitney and Hamilton simultaneously on June 8, 1960 and for nine weeks a major power struggle ensued as a result of the unions' attempt to force the defendant to grant increased economic concessions to the employee-unions. The strike was marred by employee violence with resulting mutual antipathy on both sides, which culminated in state court judgments for substantial damages against both plaintiff unions.[3]

When settlement discussions appeared to reach an impasse, the International Union sent its general counsel from its Washington, D. C. headquarters to attempt an amicable settlement. It appeared at first that his efforts and suggested recommendations would solve the impasse; but on or about July 7, 1960, it became apparent that the local union leaders were resisting his proposed settlement terms. The general counsel then withdrew his active participation in the negotiations, until he might be given a more meaningful authority to effect binding negotiations with the active backing of the local unions' leadership. (Tr. 9006; DX-75).

On or about July 18, 1960, the local leadership agreed to recommend to its members any agreement he might negotiate and approve. (Tr. 8921). The plaintiffs' general counsel then resumed negotiations and a mutually acceptable agreement was worked out, on terms which would have settled the strike. The details were expressed and documented in a set of written notes compiled by the plaintiffs' and the defendant's attorneys. (Tr. 8923; PX-310; DX-20; see also

DX-76). Although the bargaining committees for the unions had agreed to support and recommend the terms of such a settlement, when the time came to submit the proposal to the membership for ratification on July 23, 1960, the union bargaining committees declined to recommend acceptance (Tr. 8812, 8923) and the membership voted down the proposed settlement by a vote of approximately 3,800 to 300. (Tr. 8836). This meeting of the membership, became so tumultuous, violent, and out of hand, that the general counsel feared for his own personal safety and he too refrained from recommending ratification. At this point he left town and declined to participate further in any negotiations in behalf of the local unions. (Tr. 8834-35).

The Governor of Connecticut arranged a meeting in New York City on August 5, 1960, between a few key officials of the defendant corporation and the national president of the International Union and its general counsel. While the evidence discloses substantial agreement between the parties on much that was discussed and orally agreed to at this informal meeting, there was violent disagreement at the trial on whether the new terms agreed to were substantially identical with those rejected by the membership on July 23, 1960. Papps, the plaintiffs' general counsel, claimed that Burke, the defendant's Executive Vice-President and negotiating representative, referred to certain written notes at the August 5th conference (PX-312; Tr. 8843) which had been mutually prepared by the parties prior to the abortive membership meeting of July 23rd and that the latter agreed the terms of settlement would embody the same "package." The

3. United Aircraft Corp. v. IAM and Local 1746, Civil Action No. 133884, State Superior Court, Nov. 26, 1968. Judgment now on cross-appeals; awarding plaintiff to recover of defendants $1,369,725.25 damages, with statutory interest thereon from August 12, 1960, $197,333.33, exemplary damages and costs taxed at $739.-90.

Also: United Aircraft Corp. v. IAM and Local 743, Civil Action No. 133885, Superior Court, Nov. 26, 1968. Judgment now on cross-appeals; awarding plaintiff to recover of defendants $88,662.00, with interest thereon from August 12, 1960, $98,666.67, exemplary damages, and its costs taxed at $241.70.

defendant, through Burke, vigorously and steadfastly denied that this conversation ever occurred or that any such document was ever shown to him on that occasion.

It was mutually agreed at the New York conference that the strikers who desired to return to work would register; that those who had engaged in misconduct during the strike would have their cases reviewed by a panel of arbitrators (Tr. 9014–17; DX–76); that those who returned to work by September 1, 1960 would not lose their continuity of seniority, because of absence during the strike, but those who returned between September 1, and December 31, 1960 would lose seniority only between September 1 and the date on which they returned; and that those who returned prior to January 1, 1961 would receive vacation pay. It was mutually understood that all strikers who registered would not be immediately returned to work, because both divisions of the defendant corporation had been hiring permanent replacements, since July 11, 1960. The terms governing wages, hours, and working conditions would be the same as previously proposed under the tentative agreement reached for a new labor contract on December 4, 1959, except that there would be no "wage reopener;" in its stead a general wage increase of from seven (7) cents to twelve (12) cents per hour would become effective January 2, 1961. As a further consideration, the defendant agreed to withdraw a petition it had filed with the NLRB, wherein it requested that an election be ordered to determine whether or not the union represented a majority of defendant's employees at Pratt & Whitney.

Upon returning to Hartford, the defendant's representatives met the following day with Grand Lodge representative, Richard Thurer, who had previously represented both plaintiff unions in the contract negotiations. The purpose of the meeting was to explain and iron out with the local union officials the detailed terms and administrative procedures which would be followed based upon the tentative agreement reached in New York on the previous day. It was fully explained and understood that all strikers who registered would not be immediately returned to work, because their jobs had already been filled during the strike by permanent replacements. Hamilton's estimate was that the non-returning personnel would approximate between 400–500; at Pratt & Whitney the number was believed to be much greater.

The defendant explained that the hiring of permanent replacements for both divisions was still going on every day and even if the strike were settled within the next few days, there would be a number of people who had already been hired, who would still be reporting to work within the next two weeks. It was explained further that those for whom jobs were not immediately available would be placed on a preferred hiring list until December 31, 1960, when their preferred status would expire.

Pratt & Whitney Lodge #1746 scheduled its membership ratification meeting for August 7, 1960, while Hamilton Standard Lodge #743 called its meeting for the following day. The membership of Lodge #1746 originally rejected the proposed settlement agreement. However, when Lodge #743 accepted the proposal the next day, Lodge #1746 called another meeting for August 9, 1960, at which its membership reconsidered its prior action and ratified the proposed settlement agreement. Simultaneously, at these same membership meetings, the unions approved new collective bargaining labor contracts governing working conditions, wages, and union recognition.

The registration of strikers commenced at Hamilton August 9th, the day after ratification; 1,721 registered at the Windsor Locks plant and 300 registered at the Broad Brook plant. Union representatives participated in the registration procedures and simultaneously recorded the identity of the registrants. Registration at Pratt & Whitney commenced on August 11, 1960 and with few exceptions,

it was completed on the 13th. Approximately 4,515 strikers registered at East Hartford and 20 at Manchester. The defendant subsequently supplied Lodge #1746, at the latter's request, with a list of all strikers who had registered. (PX–160).

The Strike Settlement Agreements drafted by the defendant (Tr. 3009–10) were reduced to writing and executed by the parties on August 11th, 1960. The company represented that these were modeled after the strike settlement agreement originally proposed by Seminole Lodge #971, an affiliate of the plaintiffs' International Union, and previously accepted by the defendant as a basis for settling the strike at the latter's Florida plant on July 15, 1960. (Tr. 3016–17; DX–5).

## EXPLANATION OF TERMS

In order to clarify the terms used in this opinion relating to the company's use of personnel classifications, the Court hereby outlines their meaning.

*Job Code:* It is a number used to designate a particular set of duties, responsibilities and functions which have been drawn together in a single job assignment and to which a job title is affixed. (Tr. 4740–41, 80–81).

———◆———

Based on his job code, an employee is classified in a seniority area and in an occupational group. These latter classifications are important because an employee ordinarily has seniority and thus recall preference during periods of layoff within his seniority area and occupational group.

*Seniority area:* At Pratt & Whitney it consists of a group of departments in an administrative area, which are grouped and given a number; each area is treated as if it were a separate plant. Since 1960, Hamilton has grouped some of its departments into seniority areas but others are separate and distinct. (Tr. 453–6).

*Occupational Group:* A group designation used to identify a class of skills that have a commonality, but which are not interchangeable, except as within a seniority area. There were 116 such groups listed in the Pratt & Whitney labor contract; however, the same group might appear in 10 to 20 different seniority areas and thus there were a total of approximately 440 occupational groups spread over 23 seniority areas. (Tr. 5360–63; 4742–44).

*Seniority:* Means the number of work weeks of prior employment with this employer, with which the employee is credited under the labor contract. This seniority does not cross seniority area lines either contractually or as a matter of practice. Seniority ordinarily gives a senior employee priority in being retained during layoff over less senior employees; and the right of recall in the same occupational group and seniority area over other employees of lesser grade. (Tr. 5369–71). Seniority code #1 commences with the first week of January 1925, the year the defendant was founded; subtracting the code number from the current week

number would disclose the employee's weeks of seniority, provided they have not been interrupted. (Tr. 5506).

*Demonstrated ability:* One who had previously done the job and demonstrated his ability. (Tr. 3015).

*Shifts:* *Pratt & Whitney:*

1st shift: 7:00 A.M to 3:30 P.M.

2nd shift: 3:30 P.M. to 12:00 midnight.

3rd shift: 12:00 midnight to 7:00 A.M. (Tr. 1469–71).

*Hamilton:*

1st shift: 7:30 A.M. to 4:00 P.M.

2nd shift: 4:00 P.M. to 12:30 A.M. (one-half hour for lunch) (Tr. 1732).

*Labor Grade:* The highest labor grade at Pratt & Whitney is l.g. #1; the lowest is l.g. #11. Grades #9 through #11 are unskilled jobs. (Tr. 611, PX–93). At Hamilton the highest labor grade is l.g. #1; the lowest is l.g. #12. (PX–95, PX–97, PX–154, PX–155; Tr. 2024–25).

*Rates:* In each labor grade there are four (4) steps within the rate range reached through a merit rating system. "J" rate is job rate; "R" rate above standard; "P" rate is premium; and "T" rate is top. (Tr. 1423, 2738).

*Straight Time:* Hours worked during scheduled "standard pay period," which is not compensated for at overtime rates. On the third shift this actually means working six and one-half hours while being paid for eight hours. (Tr. 8470).

———◆———

## THE AGREEMENTS

The written agreements as drafted were basically alike, except that paragraphs 4(b) and 4(c) of the recall provisions in the Hamilton contract introduced the element of "demonstrated ability" in addition to the seniority factor as criteria for recall. This essential difference must be continuously borne in mind, when any attempt is made to treat the two agreements as if they were the same, in respect to the recall of registered strikers. (Tr. 242). At the August 11, 1960 meetings, where the agreements were signed, the representatives of Hamilton Lodge #743 requested no changes in the Strike Settlement Agreement, except that paragraph 4(b) be changed to read, that if a striker's pre-strike job was not available, he would be returned to a "comparable job." The defendant consented to this change and the original phrase "treated as if they had been laid off" was deleted. The word "comparable" was inserted before the phrase *"or other available jobs."*

The Hamilton agreement provided that registered strikers would be recalled to work in the following manner:

"(a) If the job held prior to the strike (i. e., same job code, department, and shift) is available, the registering striker will be returned to that job.

"(b) If such job is not available, strikers will be recalled to comparable or other available jobs in accordance

with their seniority and demonstrated ability pursuant to Article VII, Sections 1 and 2, of the Windsor Locks contract ratified by the union on August 8, 1960, or pursuant to Article VII, Section 1, of the Broad Brook contract ratified by the union on the same date.

"(c) Strikers for whom no job is available in accordance with (a) and (b) above will be placed on a Preferred Hiring List and will be recalled to *job openings which develop* at any time prior to January 1, 1961, *before new employees are hired.* Employees on such Preferred Hiring Lists will be recalled to job openings in the order of their seniority and demonstrated ability pursuant to Article VII, Section 1 and Section 2, of the Windsor Locks contract ratified by the union on August 8, 1960, or pursuant to Article VII, Section 1, of the Broad Brook contract ratified by the union on the same date.

"Separate Preferred Hiring Lists shall be established for returning strikers employed at the Windsor Locks plant and those employed at the Broad Brook plant." (Emphasis added.) (Exhibit A to the Consolidated Amended Complaint).

The Pratt & Whitney Lodge #1746 representatives executed the proposed draft in its original form as presented by the defendant without any change. Paragraph 4(a) was identical with that at Hamilton in respect to the recall of registered strikers to the same job held prior to the strike, if it was available; but the provisions of paragraphs 4(b) and 4(c) established different criteria for the recall of the remainder. It provided:

"(b) If such job is not available, strikers will be treated as if they had been laid off, and will be recalled to other available jobs in their occupational groups and seniority areas in accordance with their seniority, pursuant to Article VII, Section 1 and Section 2, of the contract ratified by the union on August 9, 1960.

"(c) Strikers for whom no job is available in accordance with (a) and (b) above will be placed on a Preferred Hiring List and will be recalled to job openings in their occupational groups and seniority areas which develop at any time prior to January 1, 1961 *before new employees are hired.* Employees on such Preferred Hiring Lists will be recalled to such job openings in the order of their seniority pursuant to Article VII, Section 1 and 2, of the contract referred to above.

"Separate Preferred Hiring Lists shall be established for returning strikers employed at the East Hartford plant and those employed at the Manchester plant." (Emphasis added.) (Exhibit B to the Consolidated Amended Complaint).

The Hamilton Strike Settlement Agreement provided that if the identical job was not available, strikers would be recalled to comparable or other available jobs in accordance with seniority and demonstrated ability, as is provided in Article VII, §§ 1 and 2 of the labor contracts. (PX–95, Windsor Locks plant; PX–97, Broad Brook Plant). Article VII, §§ 1 and 2 referred to the terms of layoff and recall because of lack of work. It recognized the principle of recall to specified seniority areas based not alone on seniority, but required that there be weighed with it the additional element of "demonstrated ability." Under layoff circumstances, the labor agreements at Hamilton authorized management to offer a transfer to an employee scheduled to be laid off in one seniority area, to a job in a different seniority area; and to recall a person laid off in one seniority area to a job in a different seniority area, provided no other laid off employee had greater seniority in that area. These seniority areas are defined in Appendix B of the Windsor Locks contract and there are a total of twenty-six (26). Fourteen comprise a single department, eleven (11) comprise two departments

and one (1) is made up of four departments. The Broad Brook agreement is the same as that in Windsor Locks, except that it identifies seniority areas by individual departments.

In comparison, paragraph 4(b) of the Pratt & Whitney settlement agreement simply provided, that where the strikers' identical pre-strike jobs were not available, they would be treated as if laid off and, based solely on their seniority, would be recalled to other available jobs in their respective "occupational groups and seniority areas;" the element of "demonstrated ability" was not contained in the Pratt & Whitney agreement. Article VII of the Pratt & Whitney labor contract (PX–93) provided for recall to "noninterchangeable occupational groups within specified seniority areas" in accordance with the principles of seniority. It also permitted management to offer a transfer to an employee scheduled to be laid off from a job in a different occupational group or to recall an employee laid off from one occupational group to a job in a different occupational group, provided no laid off employees had greater seniority in that area. These occupational groups and seniority areas are defined in Appendix B and C of the Pratt & Whitney labor contract. It allows for 116 occupational categories arranged by groups into 23 seniority areas.

Paragraph 4(c) in both Strike Settlement Agreements was substantially the same. It provided that strikers for whom no job was available in accordance with paragraphs 4(a) and 4(b) would be placed on a Preferred Hiring List and recalled to job openings which developed at any time prior to January 1, 1961, before new employees were hired, pursuant to Article VII, §§ 1 and 2 of the respective labor contracts. The criteria for the order of recall differed because the Hamilton labor contract permitted recall to the striker's "pre-strike seniority area" and to a comparable job where he had "demonstrated ability." Pratt & Whitney's labor contract, on the other hand, provided more limited guidelines of recall, conditioned solely on there being a job *available* in the striker's "pre-strike seniority area and noninterchangeable occupational group."

The collective bargaining labor contracts were incorporated by reference in these Strike Settlement Agreements, and they reserved to management in the "Witnesseth Clause," "the sole right and responsibility to direct the operations of the company." This reservation specifically included the right to select, hire, promote, demote, and transfer employees, unless otherwise provided by the contract. This reservation of authority was further strengthened by a supplemental agreement to both the Hamilton and Pratt & Whitney labor contracts dated August 16, 1960. In this supplemental agreement the parties attempted to further clarify their intent and define the prerogatives of management, reserved in the "Witnesseth Clause." It stated that these reservations could not be lessened, diminished, or affected by the powers entrusted to an arbitrator; and provided: (1) Management's right to determine the size and number of the working force in the active employ of the Company; (2) Its right to determine whether the Company's work should be performed by employees of the Company or by independent contractors; (3) Its right to determine the identity of Company's personnel to whom work shall be assigned; (4) Its right to determine whether transfers, promotions, or demotions are to be made; and (5) The identity of or the number of new employees to be hired. (PX–93, following Appendix "C"; PX–95, PX–97).

The parties executed an arbitration agreement on August 24, 1960, affecting the eligibility of 50 registered strikers (Tr. 9032) who had been accused by the defendant of strike misconduct. It provided for the appointment by the Chief Justice of the State Supreme Court of a panel of three arbitrators, to consider whether this alleged misconduct warranted a refusal of management to accord them full recall rights. Before final adjudication by this panel, three accused employees resigned and their cases

888

were considered moot; seven were withdrawn from consideration by the plaintiff and abandoned; four were withdrawn by the defendant and the validity of their rights as registered strikers consented to by the defendant; six were found not guilty of misconduct by the panel and thirty were found guilty. Of this latter number fifteen were ordered deprived of all rights of recall and ten were placed at the bottom of the "seniority area and occupational group listing." Two were rehired and returned to work on December 5 and 6, 1960. In the remaining five cases, the arbitrators held that they should be deprived of periods of seniority ranging from one to three years. Of these, one was reached on the preferred hiring list and returned to work December 5, 1960.

Thus there were three sets of interrelated agreements between the parties which were instrumental in settling this strike; all of these must be weighed and considered in defining the parties' intentions and conduct:

(1) The Strike Settlement or Recall Agreements dated and executed August 11, 1960;

(2) The collective bargaining labor agreements dated August 9, 1960 and executed August 16, 1960; together with the supplemental memorandum agreement of August 16, 1960, designed to clarify the meaning of the management prerogatives reserved to the defendant company in the "Witnesseth Clause" of the contract.

(3) The arbitration submission of August 24, 1960, relating to the fifty (50) strikers whose strike misconduct was challenged by the defendant, as grounds for forfeiting their rights to recall.

During the lengthy Court trial, multiple tangent issues were injected into the controversy by the litigants. Cognizant of the board spectrum of human relationships involved in any labor relations litigation and being desirous of avoiding the omission of any significant issues in dispute, the Court requested the parties to submit a statement of the factual and legal questions, which they considered essential. The Court suggested that the parties stipulate to an agreed statement of issues, with the understanding that in doing so, they would not be considered as waiving any factual or legal claims omitted, but heretofore advanced. The Court has utilized this stipulation as a basis for establishing the questions to be decided.

ISSUES

1. Did the defendant-employer breach the Strike Settlement Agreements by failing to recall registered strikers to the jobs they held before the strike, unless the striker had been permanently replaced or unless the striker's job had been permanently abolished during the strike for legitimate economic reasons?

2. Did the defendant breach the Strike Settlement Agreements by filling jobs during the strike settlement period by transfer, promotion, and demotion rather than by recalling registered strikers?

3. Did the defendant breach the Strike Settlement Agreements by failing to recall strikers whose jobs at the end of the strike were occupied by (a) summer employees; (b) non-bargaining unit trainees, who had been transferred into the bargaining unit during the strike?

4. Whether the defendant in negotiations at the Governor's conference held in New York City on August 5, 1960, orally agreed (a) to offer union officers a job; (b) to continue the preferred hiring provision of the agreement for a period of six months; (c) offer unrecalled strikers jobs in occupational groups and seniority areas other than the occupational group and seniority area such strikers had occupied before the strike, provided such strikers were qualified and no strikers from these groups and areas were awaiting recall; (d) to recall strikers whose former jobs were unavailable to "comparable jobs," and if so, to the extent it differs from the written agreement of August 11, 1960, is it binding upon the defendant.

5. Did the defendant breach the Strike Settlement Agreements by failing to maintain a preferred hiring list in a form similar to the layoff lists previously used in layoff situations or did it conceal such lists from the plaintiffs.

6. Did the defendant breach the Strike Settlement Agreements by failing to provide plaintiffs with information requested by plaintiffs during the settlement period or by failing to disclose to plaintiffs that it had periodic data processed list which it used in its personnel department.

7. Did the defendant breach the Strike Settlement Agreements by depressing the total bargaining unit during the life of the Strike Settlement Agreements through December 31, 1960 to avoid its contractual obligations.

## DISCUSSION OF THE MERITS

### Issues Conceded to be Excluded

It should be made clear at the outset, that the plaintiffs have made no claim, as to the ineligibility of any new employee (stranger) being hired between September 1, 1960 and December 31, 1960, aside from the conditional hires, because there was a qualified registered striker awaiting recall. (Tr. 2502–3, 2507, 2522, 976). Furthermore, there is no claim made by the plaintiffs in this action as to any discrimination occurring after January 1, 1961, pertaining to registered strikers on the preferred hiring list, who might claim they were discriminated against after that date; such issues, if they exist, are regarded to be solely within the jurisdiction of the NLRB. This is a contract action, wherein the plaintiffs' claims are limited to the period of the Strike Settlement Agreement. (Tr. 2398–99, 4268).

## JURISDICTION

 This action is properly within the jurisdiction of the Court pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. The defendant concedes jurisdiction, but questions the advisability of having the same issues litigated simultaneously before the Court and the NLRB. (Tr. 996–98).

"The authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301. If, as respondent strongly urges, there are situations in which serious problems will arise from both the courts and the Board having jurisdiction over acts which amount to an unfair labor practice, we shall face those cases when they arise." Smith v. Evening News Assn., 371 U.S. 195, 197–198, 83 S.Ct. 267, 269, 9 L.Ed.2d 246 (1962).

See, NLRB v. Great Dane Trailers, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); Carey v. Westinghouse Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); United Steelworkers v. American Internat'l. Aluminum Corp., 334 F.2d 147, 153 (5th Cir. 1964); Textile Workers Union of America v. Arista Mills Co., 193 F.2d 529, 533–534 (4th Cir. 1951).

Labor issues may be both a public violation, subject to the scrutiny of the NLRB, and a private contract violation subject to the Court's jurisdiction. The plaintiff-unions, as the exclusive bargaining agent of the employees, have standing to litigate their employee's interests under the law.

Section 301 of the Labor Management Relations Act provides:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce * * may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"(b) * * * Any such labor organization may sue or be sued as an entity and in behalf of the employees whom

890

it represents in the courts of the United States."

█ Agreements which are subject to § 301 must be construed, if possible, to effectuate national labor policy. Construction which would bring such an agreement into conflict with substantive labor law should be avoided.

"We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws. * * * The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. See Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 351, 60 S.Ct. 285, 84 L. Ed. 313, 317. Federal interpretation of the federal law will govern, not state law. Cf. Jerome v. United States, 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L. Ed. 640, 643. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy. See Board of Commissioners of Jackson County v. United States, *supra,* at 351–352, 60 S.Ct. 285. Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights." Textile Workers v. Lincoln Mills, 353 U.S. 448, 456–457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957).

See, John Wiley & Sons v. Livingston, 376 U.S. 543, 550, 84 S.Ct. 909, 11 L.Ed. 2d 898 (1964); Local 89, General Drivers v. Riss & Co., 372 U.S. 517, 519–520, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 279–280, 76 S.Ct. 349, 100 L.Ed. 309 (1956); 4 Williston on Contracts, §§ 615, 621 (3d ed. 1962).

## BURDEN OF PROOF

██ Whether the burden of proof, in its primary sense, rests upon the plaintiffs or the defendant is ordinarily to be determined by ascertaining from the pleadings, which of the parties would be compelled to submit to an adverse judgment, before the introduction of any evidence. The burden of proof rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the action is concluded. Reliance Life Co. v. Burgess, 112 F.2d 234, 237–238 (8th Cir. 1940); Lilienthal's Tobacco v. United States, 97 U.S. 237, 24 L.Ed. 901 (1877); Hotel Co. v. Wade, 97 U.S. 13, 24 L.Ed. 917 (1877); Davis v. O'Hara, 266 U.S. 314, 45 S.Ct. 104, 69 L.Ed. 303 (1924); Nikitiuk v. Pishtey, 153 Conn. 545, 553, 219 A.2d 225 (1966); Wetherell v. Hollister, 73 Conn. 622, 626, 48 A. 826 (1901); Silva v. Hartford, 141 Conn. 126, 104 A.2d 210 (1954); 29 Am.Jur.2d §§ 128–130.

█ The burden of proof in the secondary sense of going forward with the evidence rests upon the party, who at the particular state of the trial, is required to meet a prima facie case established by his adversary, once sufficient evidence has been offered to justify a finding. 29 Am.Jur.2d §§ 127 (f14, § 132).

" '(W)here * * * a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by that party.' [Quoting 1 Greenl.Ev. § 79] * * *

"This burden, however, which was simply to meet the prima facie case must not be confounded with the preponderance of evidence, the establishment of which usually rests upon the plaintiff." United States v. Denver

R.G.R.R., 191 U.S. 84, 92, 24 S.Ct. 33, 35, 48 L.Ed. 106 (1903).

The principle of proof which requires the defendant to go forward with the evidence, when the plaintiff has presented a prima facie case and the explanatory information is peculiarly within the defendant's knowledge and control, is analogous to the legal concept regularly applied in NLRB enforcement proceedings. The latter proceedings generally treat the defendant's averments as an affirmative defense, wherein the burden of persuasion rests with the defendant.

"(O)nce it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." NLRB v. Great Dane Trailers, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967).

"To rely on the *Mackay* case it would have been necessary to convince the Board that the reason for (respondent's) refusal to rehire was that the jobs had been immediately filled." Firth Carpet Co. v. NLRB, 129 F.2d 633, 636 (2d Cir. 1942).

See, Nabors v. NLRB, 323 F.2d 686, 690 (5th Cir. 1963); NLRB v. Cambria Clay Products Co., 215 F.2d 48, 56 (6th Cir. 1954); New Orleans Roosevelt Corp., 132 N.L.R.B. 248, 250 (1961).

■ In the present civil action, the primary burden of proof has not changed; it rests with the plaintiffs to submit substantial evidence upon which the Court may base essential findings in their favor. However, where relevant and material facts rest peculiarly within the defendant's knowledge, it will be incumbent upon it to come forward with the proof; and should it fail, an inference is raised that the evidence, if produced would be unfavorable to its cause. The plaintiffs' basic burden of proof, their responsibility for the overall persuasion of the Court in establishing the factual truth of their allegations, still remains with them; and that burden requires that they prove all the essential material allegations of their case on each issue submitted, by a fair preponderance of the evidence.

## CONDITIONAL HIRES

On August 9, 1960, the date the strike ended at Pratt & Whitney, there were 389 "new hires" and on August 8, 1960, 61 "new hires" at Hamilton, who had been hired as permanent replacements for strikers during the strike period but were scheduled to report for work on agreed dates subsequent to August 8, 1960. (PX-137, p. 2; PX-138, p. 2; Tr. 398-9).

The plaintiffs concede that they had been informed by the company, that the latter had made commitments to hire certain people during the strike period who would be reporting for work after the strike ended. However, the plaintiffs claim the defendant had in actual fact made no such contractual commitments. (Tr. 509-10, 2854). The plaintiffs admit that if a legally binding contract had been made, defendant would be justified in treating these jobs as unavailable to strikers at the end of the strike. (Tr. 511-13, 2856-57).

The plaintiffs' rationale is that these new employees had not been actually hired as of August 8, 1960, because they had not been effectively put on the payroll before the termination date of the strike. (Tr. 2713). They contend that they were in fact conditional hires, because they had not yet passed the required medical examination, a prerequisite to being put on the payroll. (Tr. 385-86). The plaintiffs argue that such a "new hire" in this category should be simply classed as an applicant who had been interviewed. (Tr. 701-3). Since the put-on date was ordinarily the date of actual hire (Tr. 2716), when the strike ended, the defendant should have considered all of these jobs, which had been promised to the conditional hires, to be immediately available to the strikers

who had occupied them prior to the strike under Paragraph 4(a) of the Settlement Agreement. (Tr. 404–5). The plaintiffs' position is that the applicant ran the risk that the striker might return to work before he was put-on, or that the strike would end and the company's need for employees might be such that it would have no room for him. (Tr. 408). Plaintiffs' position is that notwithstanding the admitted fact, that the defendant did timely advise the plaintiffs during settlement negotiations of the status of these new hires and agree how they should be treated, since they were not in fact technically on the payroll as permanent replacements when the strike ended, it mattered not what the parties had understood or agreed.

The defendant employer had commenced hiring permanent replacements for strikers at both plants beginning shortly after July 7, 1960. (Tr. 492). It advised the plaintiffs at the Park Lane Hotel conference meeting on August 5, 1960, in New York City, that a considerable number of employees had already been hired at both plants, who would have to be put on the payroll, even if a settlement were immediately reached; that the hiring of permanent replacements was still continuing and commitments for permanent jobs were being made daily by the defendant. (Tr. 701–2, 764, 2074–5, 3506). The following day, August 6, 1960, the defendant again discussed with the plaintiffs' local officers and committee representatives the details of the proposed settlement, and explained to them that there were a number of new hires, who had not yet returned to work, who would be reporting in a week or two. A discussion of the subject arose again at the time of the execution of the Strike Settlement Agreements with Pratt & Whitney Lodge #1746 on August 11, 1960 (Tr. 5474–77) and at the Hamilton Standard meeting on August 16, 1960, when the new collective bargaining labor agreement was signed. At the latter meeting, President Seedman inquired when the last strike period "new hire"

would be reporting to work, and Vice-President Burke directed his personnel director Vandervoort to check the records and report the accurate count to the union president. This information was given to Seedman the same day, namely, that out of a total of 86 at Windsor Locks, all but seven had reported; and of the 47 at Broad Brook only three remained to report. (Tr. 3508). On the afternoon of that same day, with Lodge #1746, the same question was advanced pertaining to the number of new employees who had been hired at Pratt & Whitney, but had not yet reported to work. The defendant estimated between 300–350 (Tr. 5474–76).

The defendant-company's position is that once an applicant had accepted employment and had been assigned to a specific job in the bargaining unit, it could not legally or morally unilaterally withdraw from the employment agreement. (3831–2). Some of these "new hires" had deferred reporting to work, because they required time to work out notices with their then present employer, or make arrangements to move here from out of state. Still others of the 228 Pratt & Whitney "new hires" for whom there was a gap of two weeks or more between the date of their interview and the date they started work, may not have reported during August 1960, because of the two week partial shutdown in some sections of the plant. (Tr. 2853–54, 2861, 2891, 9443). The defendant conceded that employment practices provided that should any "new hire" fail to pass the physical examination required, he could not be put on the payroll. (Tr. 3828). The defendant's position is, however, that such a person had in fact already been hired and vested with a specific job and could only be divested of his job by reason of a subsequently disclosed physical defect or some other subsequent information which might reveal him to be a security risk. While inquiries were made by the unions and discussions had between the parties relating to the number yet

to report at a given time, no question was ever raised during the settlement period challenging the legal correctness of the defendant's procedures or its interpretation and administration of the Settlement Agreements on this issue. Not until after this suit was initiated more than a year later, did the unions, for the first time, suggest a legal distinction on this issue of the defendant's job commitment to these hires.

"(I)ntention can be determined from the language used and the circumstances known to both parties under which the negotiations were had. The contract must be read in the light of the whole relationship between the parties." Hess v. Dumouchel Paper Co., 154 Conn. 343, 348, 225 A.2d 797, 800 (1966).

▮ The plaintiffs' position is unsupported by the facts and is without merit. The Court finds that the defendant had the intention and did in fact bind itself to a firm contract of employment, at the moment it agreed to employ the "new hires" and that the latter had each accepted a specific job assignment. The possibility that they might be subsequently divested of such jobs, because of medical or security reasons is too remote and speculative to change the contractual relationships.

"It is a well-settled rule that an employer may fill positions left vacant by employees going out on an economic strike, and that he is not later 'bound to displace men hired to take the strikers' places in order to provide positions for them.' N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); Vogue Lingerie, Inc. v. N. L. R. B., 280 F.2d 224, 226–227 (3d Cir. 1960); see Olin Mathieson Chemical Corp. v. N. L. R. B., 232 F. 2d 158, 160–161 (4th Cir. 1956), aff'd per curiam, 352 U.S. 1020, 77 S.Ct. 587, 1 L.Ed.2d 562 (1957); N. L. R. B. v. Industrial Cotton Mills, 208 F. 2d 87, 91 45 A.L.R.2d 880 (4th Cir. 1953). Under these cases, the critical

time seems to be when the arrangements with the replacement workers became irrevocable and fixed, a readily determinable fact. Applying this rule to the present case, if the company is found to have bound itself irrevocably by contracts of employment made with the replacement employees some time before they went to work then we think that the grievance is covered by the exclusion clause because the critical event, that of hiring, occurred within that period. On the other hand, if there was an informal arrangement in which the company told the men only that jobs would be available to them if they presented themselves at the plant, then there was not any hiring until the men began work * * *." International Ass'n of Machinists, Lodge 1652 v. International Aircraft Services, Inc., 302 F.2d 808, 812–813 (4th Cir. 1962). Having been fully appraised of the defendant's firm commitment as permanent employees to this category of new hire, prior to the signing of the Settlement Agreements, the Court finds that the plaintiffs assented and agreed to these strike period "new hires," as employees in those jobs to which they had been specifically assigned, on or before the actual settlement dates, which were August 8, 1960, in the case of Hamilton, and on August 9, 1960, in the case of Pratt & Whitney. The plaintiffs' belated attempt to claim that they were then unaware, on the date the Settlement Agreements were signed, that these hires had not been actually cleared by medical examination and thus that they were not hired under an irrevocable agreement, is ingenious but unpersuasive and untenable.

## PERMANENT REPLACEMENT OF ECONOMIC STRIKERS

The plaintiff-unions have launched a scattergun type of attack on the defendant's claimed violations of the Strike Settlement Agreements; they claim that practically everything the defendant did in administering the Settlement Agree-

ments was unlawful and carried out with evil motives. Where the settlement contracts afford the plaintiffs' membership greater rights than the national labor law, they tenaciously stress the terms of the settlement contract; but where the inverse position would seem to be more advantageous, they minimize the applicability of the contract terms and seek to apply principles and policies embodied in established precedents under the body of federal labor law. The great majority of policy-making decisions in this field of the law have generally emerged from a relationship, where there has been a complete absence of a specific strike settlement agreement. In those situations, courts have been called upon to hew and shape general labor law principles and supplemental corollaries, to safeguard the unwritten rights of the litigants.[4] In this case, however, we are dealing with specific recall conditions which are contractual in nature and establish with considerable specificity the mutual obligations of the parties.

The plaintiffs represent that the company violated the Strike Settlement Agreements by treating those jobs occupied by new hires and transferees during the strike period, as if they were permanent replacements and thus made these jobs unavailable to the registered strikers when the strike ended. This position is founded upon the legal premise that the economic strikers, who have not been permanently replaced, retain their employee status, their seniority and right of reinstatement. Their status with respect to available jobs cannot be subordinated to that of other employees or otherwise discriminated against. See, Olin Mathieson Chem. Corp. v. NLRB, 232 F.2d 158, 169 (4 Cir. 1956), aff'd per curiam, 352 U.S. 1020, 77 S.Ct. 587, 1 L.Ed.2d 562; NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); NLRB v. Erie Resistor Corp., 373 U.S. 221, 230, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); NLRB v. Great Dane Trailers, 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).

The plaintiffs reach out even further in their rationale and represent that those strikers whose pre-strike jobs were occupied at the end of the strike by permanent strike period hires and transfers were not in fact permanently replaced. (Brief for Plaintiffs at 271; Tr. 3817). This theory advances the claim, that the defendant made permanent hires and transfers during the strike as additions to the work complement, not as replacements. They contend that defendant's conduct in this regard was not made with a view toward post-strike conditions, but as a temporary makeshift arrangement to continue production during the strike. They argue that because the defendant did not specifically identify on its put-on records, which of the named strikers during the strike period each "new hire" actually replaced, (Tr. 3555) it thereby gave to these strike period new hires and transferees a priority over *all* registered strikers. To support this theory, the plaintiffs emphasize that when the defendant was asked during pre-trial discovery, to name which of the new hires had replaced specific named strikers, it responded that it did not know with complete certainty, which specific employee was absent in the capacity of a striker or whether the absence was for other personal reasons; including the absentee's hesitating to return because of fear of bodily harm. (Tr. 2272–75, 6191–92). In this respect, it may be judicially noted that the defendant recently prevailed in the Connecticut state trial court in separate suits (now on cross-appeals) arising out of the plaintiff-unions' acts of violent strike misconduct, which alleged the unlawful interference with the return to work of personnel, who might otherwise not have remained away from work. (Tr. 1938; DX–53, DX–54, DX–55, DX–56; note 3, *supra*). However, the plaintiffs claim the defendant's answer to the plaintiffs' pre-trial interrogatory constituted an ad-

---

4. See Textile Workers v. Lincoln Mills, *supra*, 353 U.S. at 456–457, 77 S.Ct. 912.

mission, that the "new hires" during the strike period were not in fact permanent replacements of strikers, because the defendant failed to state which strikers had been replaced (Tr. 1007–08, 1010). Thus, the factual issue is presented as to whether or not the striking employees had been permanently replaced.

> "(E)conomic strikers are not employees if their jobs are filled by permanent replacements during the strike before they make unconditional requests for reinstatement. * * * (T)heir employee status is not changed if their jobs are still open or are only temporarily filled." Daykin, The Distinction Between Economic and Unfair Labor Practice Strikes, 12 Lab.L.J. 189, 193 (1961).

See, Kansas Milling Co. v. NLRB, 185 F.2d 413 (10th Cir. 1950); Anderson, Clayton & Co., 120 N.L.R.B. 1208 (1958); Cranston Print Works Co., 115 N.L.R.B. 537 (1956); Chalet, Inc., 107 N.L.R.B. 109 (1953); Wilson and Co., 105 N.L.R.B. 823 (1953).

> "While the employer may know that hiring replacements tends to dissipate the effects of the strike, and thereby tends to discourage union activities, such conduct is regarded as a legitimate weapon of economic warfare. Reasonable 'discrimination' in the exercise of this right is justified by the employer's legitimate interest." NLRB v. Potlatch Forests, 189 F.2d 82, 86 (9th Cir. 1951).

See also, Olin Mathieson Chem. Corp. v. NLRB, *supra.*

When negotiations broke down between the parties on July 7, 1960, the defendant notified the plaintiffs' representatives personally and by newspaper advertising that it was embarking on a full scale hiring program and that those who were "newly hired" during the strike period would be permanent replacements for strikers. (PX–176, p. 2, PX–128, DX–75, p. 4; Tr. 5486, 1090–91, 1709, 8814–15). The defendant also distributed to each striker a printed bulletin (PX–107; Tr. 1024) advising him that during an economic strike where an employee permanently replaces an employee-striker, neither the union nor the striker can require it to subsequently discharge the replacement. (Tr. 1021).

From July 7, 1960 continuously to the date of the signing of the Settlement Agreements, all of these new employees, as well as the unions' membership knew and fully understood that these "new hires" were employed in jobs which were no longer open and available to strikers who might wish to return after the strike. (Tr. 3922). In fact, as referred to above, the litigants actually discussed this very point prior to the consummation and execution of their Settlement Agreements and the unions were even advised of the defendant's best estimate of the approximate number of registered strikers, who would have no jobs to which to return.

As these new hires were put on the payroll, the defendant did not identify on the record which specific individual the new hire replaced. (Tr. 3555). The defendant explained that considering the massive number of employees out on strike, it had no way of knowing which ones, if any, would eventually express a desire to be returned. (Tr. 6191–92). Plaintiffs' claim that this procedure permitted the company to replace all the strikers is completely without merit. Regardless of the company's personnel procedures, at the conclusion of the strike, those positions filled by replacements would be unavailable to returning strikers and those positions which remained unfilled and which had not been abolished were available to strikers.

The plaintiffs point to the pre-settlement discussions between management and the union representatives, as relating to the possible increase in openings, which might accrue, due to the strike period's abnormal and unsettled hiring conditions. Vice-President Burke expressed his best guess on the possible openings at Pratt & Whitney, based upon statistics derived from the strike experience of similar plants in the indus-

try. (Tr. 9551–53). He estimated that 10% of the strikers probably would not apply for reinstatement; that about 800 strike period hires had been employed as permanent hires, but were recognized by management as being in the category of students, who would most likely return to school shortly after Labor Day; and from experience it could be expected, that there was always a larger percentage of turnovers in new hires employed under such abnormal and unsettled strike conditions in addition to a normal increased season turnover. (Tr. 6161).

■ While a speculative discussion of the factors which might cause potential turnover, with a resulting possible increase in job openings, might encourage an attitude of optimism and hope on the part of the returning strikers, it is no justification to warrant a conclusion that the defendant knew with reasonable certainty the exact extent to which this might occur or that the defendant in making such an estimate was thereby making a firm commitment. It certainly warrants no factual finding, that such new hires were not permanent replacements. On the contrary, the evidence supports the unequivocal conclusion, that these "new hires" were not "additional hires" but rather they were put on to work as permanent replacements for strikers, who had elected not to return to their jobs during the "strike period." (Tr. 3925–26). The parties to the Settlement Agreements were fully cognizant of all these circumstances. (Tr. 549–50, 3922). These "new hires" effectively replaced the strikers whose jobs they filled and the latter lost their right to reinstatement, except as provided under the terms of the settlement contract, or as otherwise provided by federal labor law.

"(I)t does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them.

\* \* \* \* \* \*

"As we have said, the respondent was not bound to displace men hired to take the strikers' places in order to provide positions for them. It might have refused reinstatement on the ground of skill or ability \* \* \*. It might have resorted to any one of a number of methods of determining which of its striking employees would have to wait \* \* \*." NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345–346, 347, 58 S.Ct. 904, 911, 82 L.Ed. 1381 (1938).

See also, NLRB v. Plastilite Corp., 375 F.2d 343 (8th Cir. 1967); NLRB v. Fleetwood Trailer Co., supra; Vogue Lingerie, Inc. v. NLRB, 280 F.2d 224 (3rd Cir. 1960); Kansas Milling Co. v. NLRB, supra; Brown & Root, Inc., 132 N.L.R.B. 395; Ohio Ferro Alloys Corp., 104 N.L.R.B. 542, 546 (1953).

■ Confirmation of this replacement procedure is further demonstrated by the mutual understanding of the plaintiffs and the defendant, that unemployment compensation Form UC–16A should be sent to the State Unemployment Office by the employer-defendant, with the notation "no job available." This filing qualified the recipient for compensation, yet it did not remove him from the defendant's official personnel or payroll records. (Tr. 5515, 5518; DX–47, PX–59).

Upon being permanently replaced, a striker becomes entitled to unemployment compensation even though strike continues. Ruberoid Co. v. California Unemployment Ins., 59 Cal.2d 73, 27 Cal.Rptr. 878, 378 P.2d 102 (1963).

ABSENTEES—DEPARTMENT 500

■ The plaintiff-unions also complain that the defendant discriminated against registered strikers by treating inactive absentees as if they had been active. They claim that in reserving jobs for such absentees, the defendant discriminated against registered strik-

ers, since both categories of employees had been absent during the strike and should not have been treated differently on the basis of their reasons for absence. If the defendant was satisfied through acceptable objective proof that an employee's absence was the result of illness or that he failed to report, because of fear of bodily harm during the strike or as a result of an excusable personal reason, his job was regarded as availble to him. Plaintiffs represent that this distinction in treating strikers differently from inactive absentees violated the Strike Settlement Agreements.

Those who were out ill or had been absent for five or more days for personal reasons, before the strike started, were transferred, as was the custom, into Department 500 for record purposes. It was used by the personnel department as a means of disclosing protracted or repetitive absences. They remained there until the defendant was otherwise subsequently advised as to their reasons for absence. One who returned after the strike started, who had been in Department 500 and represented he had been ill during the strike and had not registered as a striker, was treated by the defendant as if he had been ill and not on strike. Those in Department 500 continued to earn seniority for vacations, Christmas bonuses and insurance coverage. (Tr. 806–09).

The Court finds no violation of the Strike Settlement Agreements, on the part of the defendant in returning those absentees to work as regular employees, upon receipt of satisfactory proof of valid personal reasons for continued absence during the strike, since such reason under ordinary and usual circumstances would have been acceptable as justifying absence before the strike occurred. Nothing had occurred between that category of employee and his employer to separate or change his status.

A more tenuous situation arises where the employee was not in Department 500 before the strike commenced, but remained absent from work because of conditions created by the strike and the fear of bodily harm; or because he became ill during the strike or had other valid personal or family reasons for absence. He then returned at the strike's termination, but did not register as a striker. For about one month after the strike commenced, the defendant attempted to record absentees on its daily reports, but found it to be unreliable and impractical. (Tr. 1257–58). No evidence was educed to demonstrate any abuse of discretion or practice of discrimination by the defendant, in applying the rule that if satisfactory proof was presented as to illness or other valid reason, the continuity of employment would not be considered as being interrupted. The Court finds that there was no evidence that the defendant used this procedure as a discriminating practice to the detriment of any registered strikers.

## DEPRESSED COMPLEMENT

### *Plaintiffs' Claims*

The undergirding theme of the plaintiffs' case is that the defendant designed and conspired a master plan, at both of the defendant's production divisions involved in this litigation, to keep the complement depressed during the settlement agreement period as much as possible, consistent with its maintaining a level of deliveries adequate to pacify its customers and avert suspicion in order to deprive the union membership of the benefits of the Strike Settlement Agreements. They assert that the defendant's underlying motive was to reduce its labor costs following the strike by hiring lower labor grade employees after January 1, 1961, when its obligation to hire from the preferred hiring list had expired. (Tr. 4989–91).

The plaintiffs in substance represent that even should the Court find that the defendant did not violate the letter of the written agreements, it violated its obligation of good faith and fair dealing which is implicit in such an agreement. The burden of proof

on this issue as on all others in this civil action, rests with the plaintiffs. They must prove that the defendant acted in an arbitrary manner designed to avoid the obligations it had assumed under the Settlement Agreements. These contracts carried with them the obligation of mutual good faith and fair dealing in their execution; and national labor law policy infused an additional element, namely that strikers could not be discriminated against in the administration of the recall provisions in the agreements.

To support their claims the plaintiffs state that on August 15, 1960, Mr. Mallet, the Pratt & Whitney General Manager, issued instructions that all department managers should immediately review expenses and take all necessary steps to keep within forecast expenses as reflected in the budget and keep shipments at a maximum. PX–255(a), p. 1, para. 2; PX–255(b), p. 1, para. 3). Thereafter, at an operating committee meeting on September 19, 1960, Morse, the personnel manager, reported: "at the end of the strike 5,000 employees from East Hartford and Manchester plants were still out; of these 4,500 registered for re-employment, 3,000 are presently back to work, and it is expected that 300–400 will be recalled by the end of the year." This would leave 1,100–1,200 registered strikers who would not be recalled by the end of the year. (PX–255 (b), p. 2, last para.). On August 19, 1960, Morse stated he was advised that the maintenance organization would do a minimum amount of work during the settlement period, (Tr. 5755–56, 5593–94, 5524, 6154) and that routine maintenance operations would be postponed. (Tr. 5593–94, 6165–68).

At Hamilton, plaintiffs offered testimony to the effect that the defendant abandoned its projected manpower needs (DX–66(b) ) and relied upon subcontracting and overtime to compensate for the manpower lost during the strike. (PX–256(a), p. 2). They claim that this is confirmed by the minutes of the operating committee meeting of August 23, 1960, which indicated that there were 1,750 production workers prior to the strike and the factory intended to hold employment at 1,600, and that this arrangement would require 20% overtime during 1960. (PX–256, p. 3, para. 2).

Plaintiffs contend that the depression in the complement in each division resulted from "policy decisions" formulated or finalized immediately after the Strike Settlement Agreements were signed and that it was successful in accomplishing its purpose. They claim that the plan not only precluded registered strikers from being recalled to their former jobs, but strikers with substantial seniority in consequence of the depression were restored to inferior jobs, where they blocked the reinstatement of other registered strikers. Plaintiffs advance the rationale that the defendant had enormous backlogs in both divisions at the end of 1960, which could have been reduced at least in part by restoring the complement. It is reasoned that the long-term benefit the defendant gained was the discouragement of strikers and union membership (PX–110, p. 1, last para.; PX–256(b), p. 3, para. 3; Tr. 1029–30), and its short term benefits included the replacement of skilled strikers receiving high labor grades with non-strikers and strikers hired in lower labor grades. (PX–154, PX–155, PX–306(a) and (b); Tr. 4044–47, 4358–61, 8346–47).

Plaintiffs further contend that the defendant adjusted its engine delivery schedule, so as to satisfy military deliveries, by scheduling fewer deliveries than it knew it could produce (PX–164), so as to reflect a bona fide appearance of extra effort in attempting to catch up on backlog. This whole scheme, according to the plaintiffs, was in furtherance of its plan to maintain a reduced work complement during the settlement period between September and December 1960. (PX–13(a), p. 24; DX–29).

Plaintiffs state that normally defendant used as little overtime as possible (Tr. 3516, 9535), but that both of defendant's divisions scheduled in advance and

used "substantial amounts of overtime throughout the settlement period." (DX–64; PX–98(b), p. 2; PX–256(b), PX–131, PX–132, PX–133; Tr. 6736–37, 5174–76, 5077–78, 4596–97). At Hamilton, 265,000 manhours of direct labor had, as of August 23, 1960, been subcontracted to 22 firms. (PX–256(b), p. 3; PX–256(c), p. 3). Defendant also employed "loan-outs" (PX–175, p. 8, para. 5–9) of which no record was kept (Tr. 3930–35, 9422–24, 4485–87, 6341–43; PX–8, p. 5; PX–21(2), pp. 83, 85, 87); and on occasion used non-bargaining unit personnel to do bargaining unit work. (Tr. 6217, 7057).

They allege the defendant's use of overtime was not unduly burdensome because under contract arrangements with the military, up to 75% of such additional cost would be borne by the Government. (PX–315, PX–316, PX–41, pp. 23–24; Tr. 9069–71, 9074–78). It is claimed that there was a direct correlation between the use of overtime and the depression of the complement in both divisions. In further support of this position, they point to the increase of average weekly overtime at Hamilton to 7.78 hours per hourly employee compared with an average of 5.25 hours during the preceding five-month period. (PX–62(c)). In similar vein, at Pratt & Whitney, plaintiffs claim that overtime was substituted for the restoration of the bargaining unit complement to its pre-strike size.

Still another devise claimed to have been used by the defendant to achieve maximum productivity with a depressed complement was the use of wholesale transfers; thereby maximizing utilization of skills and adapting to whatever might be the production pressure point of the moment. (Tr. 3569–70, 4039, 4118–19, 4346). They argue that the volume of transfers during the settlement agreement period exceeded the volume of transfers during the actual strike, when the defendant made a substantial number of transfers to balance the work force which had been depleted. (PX–37, p. 24, PX–287, PX–288).

Plaintiffs represent that the defendant's policy was to make use of available people within the plant (Tr. 4117–18), so that when jobs became "available," through turnover or increased work pressure, defendant filled the vacancies by the transfer of active employees to jobs, where they were needed most (Tr. 5193), wherever they could be spared from their current assignments (Tr. 4119, 4774, 4835); and that this policy was designed to avoid increasing the complement above the minimum required, not as defendant asserted to avoid layoff of the surplus transferred employees. (Tr. 4039, 4118–19, 4338–42, 4774–78, 4781–84, 4835, 5021, 9202, 9488–90, 9502–03).

The employee status of all remaining eligible strikers was terminated after December 31, 1960 and plaintiffs claim as evidence of defendant's prior conduct in depressing the complement, that the latter then quickly took steps to restore the complements to normal size.

Hamilton wrote on January 5, 1961 to each employee who had been terminated from the preferred hiring list requesting him to file a new employment application, if he was interested in being considered for a job for which he might be qualified. On the following day, Hamilton advertised in area newspapers, indicating that it anticipated approximately 400 job openings. At the time this ad was placed, plaintiffs claim there were approximately 844 available strikers at Hamilton, who had not been recalled and that many of them possessed skills which the defendant was seeking. Except for the letter of January 5th, the defendant made no attempt to ascertain how many of the registered strikers were qualified to fill these available jobs. (Tr. 753–63, 384, 577–79, 660–67, 672, 3945–46).

The plaintiffs have made no claim under the Settlement Contracts that these strikers had any contract rights subsequent to December 31, 1960 (Tr. 4268), and the Court will not consider the information relevant, except insofar as it sheds light upon the defendant's overall

conduct and motives prior to January 1, 1961. As discussed above, any claims arising out of the defendant's alleged unlawful conduct during the period after January 1, 1961 are the subject of a pending claim alleging unfair labor practices now before the NLRB. (Tr. 2399).

### General Administration of the Recall Agreements

Before discussing the merits of the defendant's alleged depression of the work complement, it would be helpful to discuss the general administration of the recall provisions of the Strike Settlement Agreements. In considering these provisions the parties have utilized the terms "Phase (1)," "Phase (2)" and "Phase (3)" to correspond to sections 4(a), 4(b) and 4(c) of the Settlement Agreements respectively. (Tr. 3994–97).

In phase (1) pursuant to paragraph 4(a) of the Recall Agreements, all registered strikers whose identical pre-strike job was available were immediately returned to the work complement. It should be noted that such strikers were not affected by seniority, except as it applied within the same job code. Thus a less senior registered striker within an occupational code and seniority area could be returned to work if his same pre-strike job was available in the same job code, department and shift. In practically all instances, phase (1) was completed in both divisions by September 5, 1960. (Tr. 3996).

Thereafter, at Pratt & Whitney, where no registered strikers had held the identical job on the same shift, the registered striker recall pursuant to paragraph 4(b) was the most senior unrecalled registered striker who held that same job on a different shift in the same occupational group and seniority area. (Tr. 3996).

Hamilton's paragraph 4(b) provided that where the striker's old job (shift, department and code) was not available, he would be given a "comparable or other available job in accordance with seniority and demonstrated ability." This language differed from paragraph 4(b) of the Pratt & Whitney agreement which made no reference to "comparable" jobs. However, its meaning was exactly the same in practical application as that in the Pratt & Whitney agreement, namely, that the most senior unrecalled registered striker would be given his old job on another shift, if it was available. (Tr. 9524–28). It does not mean, as the plaintiffs claim, that some other job at the same wage rate would be provided. If "pay scale" had been the measure intended, such descriptive language would most certainly have been used. When the parties negotiated the change in Hamilton's paragraph 4(b), they understood that under 4(b) a striker could only be recalled to his old job on a different shift. (Tr. 9524–28). Any other interpretation or application of the phrase would leave paragraph 4(c) of the Hamilton agreement both unnecessary and meaningless. This phase of the recall was completed for the most part, at both divisions, in early September 1959. (Tr. 3996–97).

When the initial restaffing at Pratt & Whitney had been completed pursuant to phases (1) and (2), the remaining registered strikers still unrecalled were transferred on defendant's records by means of a change of status slip to a nominal "Plant 90" (DX–44) solely for the purpose of personnel records' control. This transfer slip identified the department, shift, and job in which the striker had been before the strike, with the notation that the transfer had been made to the "Preferred Hiring List." (DX–46). This file was kept current by removing therefrom any terminations which occurred, because of resignation, death, retirement, discharge after arbitration, or failure to answer recall. It was used as the "preferred hiring list" and the source from which the company selected strikers for recall as job openings developed at any time prior to January 1, 1961, before new employees were hired. The employee was thus recalled to a job opening from "Plant 90" into the seniority area and occupational code in which the job opening developed and

where pre-strike labor grade was the same or less than the job to be filled. If the employee accepted the job and could qualify physically, he was then transferred from the record classification he held in "Plant 90" to the available active job complement. This file was sorted by seniority area, occupational code and individual seniority; and as strikers were recalled from "Plant 90" to active employment, their change of status slips were removed from the file, thereby reducing the current preferred hiring list containing the names of the registered strikers remaining to be considered for future job openings.

At Hamilton, the preferred hiring list was administered in much the same manner, except that unrecalled strikers at Windsor Locks who were on the preferred hiring list after the completion of phases (1) and (2) were transferred to a nominal "Department 800;" and those at Broad Brook to a nominal "Department 900" for record control purposes. The preferred hiring list file at Hamilton comprised the strikers' original registration cards, rather than the "change of status slips" as used at Pratt & Whitney.

At Pratt & Whitney, there were 4,515 strikers from the East Hartford plant who registered for reemployment and 20 from the Manchester plant. (DX–3, DX–3(A)). Of that number 2,270 returned to work to the identical jobs in the same department, job code and shift which they held before the strike under phase (1) and 793 returned to other jobs under phase (2). (PX–2a, lists 1 and 2 appended to answer to interrogatories Nos. 10 and 11). At the plaintiffs' request, written notice was given by the defendant to each registered striker that his name had been placed on the preferred hiring list and a Connecticut State Unemployment Notice, Form UC–16A accompanied it, so that the striker would be eligible immediately to apply for and become entitled to receive state unemployment compensation benefits. (Tr. 5514–16).

During the entire period from the end of the strike through December 31, 1960, Pratt & Whitney recalled 3,470 strikers back to work [5], 407 of whom were recalled from the preferred hiring list [6] pursuant to paragraph 4(c) of the Strike Settlement Agreement. Of the remaining 1,065 registered strikers [7] who did not return to work by December 31, 1960, 196 resigned (DX–49(D)); three retired (DX–49(C)); and 24 were among the cases submitted to arbitration who were either dismissed pursuant to the arbitrator's decisions or resigned before their cases could be submitted to arbitration. (DX–49(E)). Those still remaining on the Pratt & Whitney preferred hiring list on December 31, 1960 totaled 842.[8] Of these, 32 had been offered jobs, but failed to meet the physical requirements (DX–49(A)), 87 had been offered jobs which they refused to accept. (DX–49(F)). Of the 3,470 registered strikers who did return to work in the period through December 31, 1960, 2,744 returned to jobs in the same or at a better labor grade than they had when the strike started. (DX–3, DX–3(A)).

During the first three months of 1961, Pratt & Whitney wrote letters to 278 of the 842, who still remained on the preferred hiring list as of December 31, 1960 and advised them of an opening in their former field of work for which they might qualify and invited them to report to the East Hartford employment office within five days, if they were interested in discussing the opportunity. (PX–115

5. DX–3, DX–3A and DX–49(B). These show the registered strikers who returned (i. e., 3,445 from DX–3, 17 from DX–3 (A) and 8 from DX–49(B).

6. This number 407 is derived by subtracting from the 347 who returned during the period, the 3,063 who returned in the initial restaffing of the plants.

7. Derived by subtracting 3,470 who did return from the 4,535 who registered.

8. Figure derived by subtracting from 1,065 the 223 who resigned, retired or were dismissed through arbitration.

(A), PX–115(B)). The remaining strikers were also sent a letter, between January 1, 1961 and March 7, 1961 and advised then that if they were interested in employment at Pratt & Whitney, the company would be happy to consider them as a new applicant for employment on jobs for which they were qualified; that if the company did not hear from them within five days, it would assume that they were not interested. (PX–116(A), PX–116(B)).

Six hundred and five strikers responded to these two letters and Pratt & Whitney hired 277 of them during the first three months of 1961; 132 in January, 87 in February and 58 in March. When considering these statistics it should be borne in mind, that during the first four months of 1961, Pratt & Whitney hired 1,593 additional new employees from among 17,000 applicants for employment during that period. (Tr. 5606–07).

At Hamilton, there were 2,021 registered strikers, 1,721 of whom were employed prior to the strike at Windsor Locks and 300 at Broad Brook. (DX–26 (A), DX–27(A)). Of these, 689 strikers at Windsor Locks and 64 at Broad Brook [9] returned to the identical job, in the same department, job code and shift, which they had held immediately prior to the strike; and in phase (2), 99 strikers at Windsor Locks and 5 at Broad Brook returned to their old jobs on a different shift.

During the entire settlement period through December 31, 1960, Hamilton recalled a total of 972 at the Windsor Locks plant and 108 at the Broad Brook plant. (DX–26(A), DX–27(A)). Of these, 184 at the Windsor Locks Plant and 39 at the Broad Brook plant were recalled from the preferred hiring list pursuant to paragraph 4(c) of the Hamilton settlement agreement.[10]

Of the 749 Windsor Locks registered strikers and the 192 from Broad Brook (a total of 941) who did not return by December 31, 1960, 92 resigned, (84 from Windsor Locks and 8 from Broad Brook); 5 died (all 5 from Windsor Locks) and 1 from Windsor Locks was dismissed pursuant to the arbitration decision.[11] Also among the unrecalled strikers at Hamilton were 4 (3 from Windsor Locks and 1 from Broad Brook) who had already been offered jobs which they refused. (DX–26(B), DX–27(B).)

On or about January 5, 1961, Hamilton wrote to the approximately 843 strikers who remained on the preferred hiring list on December 31, 1960 and advised them of the termination of their preferred hiring status as of January 1, 1961. It invited them to file an up-to-date application at the employment office within five days and absent such application the company would assume they were no longer interested in employment. (PX–114).

Among the 659 strikers at Windsor Locks and the 184 from Broad Brook who remained on the preferred hiring list on December 31, 1960, about 476 from Windsor Locks and about 109 from Broad Brook filed applications for employment in the first four months of 1961. Of the 476 who applied at Windsor Locks, 142 were hired; and of the 109 from Broad Brook who applied, 35 were hired in that same period.[12] From May 1, 1961 through December 31, 1964, Hamilton hired 44 additional registered strikers, 8 who worked at Broad Brook and 36 from Windsor Locks. (DX–33). Defendant's position is that after January 1, 1961, its policy was one of non-discrimination be-

---

9. PX–11(E) shows those not returned to identical pre-strike jobs (1,032 at Windsor Locks and 236 at Broad Brook). Deducting these from the known registered gives this result.

10. 788 returned to Windsor Locks under phases 1 and 2 and 69 at Broad Brook; deducting these from the total number returned by 12/31/60 (972 at Windsor Locks and 108 at Broad Brook) results in figures used.

11. 98 Strikers are listed in DX–26(B) and DX–27(B).

12. DX–1, DX–2. During this four month period Hamilton also hired 382 new employees from among several thousand applicants.

tween strikers and outsiders. All employees hired after said date were hired as new employees without regard to seniority. (Tr. 3037–38, 3498–99, 1130–36, 4020–25, 6460–64).

### Discussion on the Merits—Alleged Depression of the Complement

In evaluating the plaintiffs' claims that the defendant designed a master plan calculated to depress the complements of hourly workers, and thus conspired to defeat the letter and spirit of the Strike Settlement Agreements, a peripheral comparison of the available statistical data alone can be most misleading. (Tr. 7489). When the Settlement Agreements went into operation, it must be remembered that the strikers who absented themselves from their work, did so without any regard to a balanced pattern in any phase of the manufacturing processes. During the strike the defendant felt obligated to provide work for all employees who remained on the job, as well as for those who voluntarily returned to work. Thus during the strike period, the imbalance in manufacturing parts increased each day operations continued. This condition was further accentuated by the fact, that many of the strikers who did voluntarily return during the strike, refused to accept work assignments ordinarily done by co-workers who still remained out.

It is apparent that the contractual obligations of each litigant is approached from opposite economic extremes. The unions' position fiercely attacks the company's alleged bad faith in not taking back all the strikers immediately or at least by September 5, 1960. It claims the inventory pipe lines of parts should have been adjusted by that time to accomplish an orderly assembly line; and if this was economically possible the company had an obligation to immediately return all registered strikers.

However, the business management and planning for a major industrial complex such as the defendant-company, is necessarily motivated by profit if it is to survive and prosper in the American competitive economy. Executives must exercise efficient business vigilance at all times in managing and carrying out the company's contractual obligations, if it is to accomplish profitable production; this is a legitimate and essential element in a capitalistic economy. The rehiring of registered strikers under the Strike Settlement Agreements was subject to the implied conditions, that those on the preferred hiring list would be recalled to available jobs, when openings occurred where their services could be utilized in economically productive work, before new employees were hired. In making these decisions of course, it was a condition precedent that the defendant would at all times act in good faith in making and carrying out its managerial decisions. However, there was no point in its having employees available who could perform operation #90 on a part, where operation #30 had not yet been completed and one procedure preceded the other by several weeks.

At Hamilton, the defendant anticipating the man-hours of manufacturing, which might be lost because of a strike, deliberately built up a pre-strike inventory backlog by increasing purchases 10–15%. (Tr. 5216); in addition it identified certain products and critical parts which required extensive lead time for their manufacture and took active steps to procure them by sub-contracting about 265,000 man-hours of production to twenty-two outside firms. To do this and still maintain a uniform quality control to insure an assembly line of readily adaptable finished parts, the company loaned out to sub-contractors many of its own jigs, dies and machine set-ups from its own lathes and production equipment.

When the strike ended, all pending contracts could not be arbitrarily cancelled and withdrawn without the defendant being liable for damages. In those instances where batches of parts had been only partially processed, the defendant could not accept them in their

semi-manufactured state, without releasing the sub-contractor from responsibility for faulty manufacture or parts failure. While this unbalanced production was flowing into the company's inventory pipe lines from sub-contractors, it could not economically duplicate this production in its own plant, nor did it possess the machines and fixtures to manufacture many of the items where the machine set-ups had been loaned out.

It was the opinion of Hamilton's operational manager, Gravelin, that the imbalance created by the strike created production problems lasting from 12 to 15 months. (Tr. 5076, 5169). He explained that the defendant could not afford calendar time to make pieces by economic lots and in order to combat the problem of imbalance, management would tear down the normal tooling on a machine, put a new set-up in to make several of the urgently needed pieces and thus release a production bottleneck. (Tr. 5078, 5175–76). The defendant requested employees who were operating critical pieces of equipment to work overtime, in order to get the maximum hours of continuous operation. (Tr. 5078, 5166). During the same period, several new products were causing manufacturing problems. This adjustment period was like fighting fires (bottlenecks) in various areas throughout the plant. (Tr. 5081, 5084, 5167). New equipment was progressively being installed. At Hamilton's Broad Brook electronic assembly plant, this included visual assembly techniques (repeating pictures synchronized with voice instructions) which increased production with a less number of employees. (Tr. 5082). Gravelin denied that there ever existed any policy, plan or practice during the settlement period to depress the employee complement so as not to return strikers. (Tr. 5084–85, 5178, 5197–98, 5212), and that had such a policy existed, he would have been aware of it. (Tr. 5213–14).

Delivery schedules at Hamilton were usually prefixed; delivery was not ordinarily as soon as possible. Production was regulated to meet a schedule and the available machines cycled to procure the parts needed within the scheduled time calendar. (Tr. 5094–95). The manpower complement cannot be relevantly compared to expected deliveries in any given month. The cost of material, engineering and parts production could represent several months effort and expenditures, yet the end product might be assembled and shipped in a matter of hours. Thus sales of very great dollar value might be shipped in any limited period and the labor cost within that period would be minimal. The lead time accumulation of value, when converted to sales dollar at a given moment cannot validly be compared with the required complement of employees, (Tr. 5108) except where the analysis is projected over several months. This principle also applies to the backlog schedule of orders. (Tr. 5143). The day the sale is made the whole dollar value becomes backlog, yet procurement of metals, engineering, tooling and parts productions may be scheduled several months or even years ahead.

Workload is measured by how long it takes to convert a raw piece of material to a finished one. Workload is a consequence of backlog plus lead time (Tr. 5119); and this is controlled by the amount of time assigned to engineering design, development, tooling and delivery schedules according to customer units required in a period of time. (Tr. 5120). During this settlement period new products accounted for between 30% and 50% of the total volume production (Tr. 5121); in addition there was an experimental department which made prototype pieces for engineering and production evaluation. It was extremely rare, upon receipt of an order to go into full scale production at that time.

Defendant's Exhibit 29 shows that beginning in January 1958 through April 1959 there had been substantial reduction in the employee population. Sales backlog from January 1958 followed this trend through April 1959. (Tr. 5138).

In those instances, sales at Hamilton in the form of actual shipments exceeded sales made in the form of contract orders received. From January 1960 through May 1960, the backlog increased, but population remained constant. (Tr. 5141–42).

The defendant represented that it never knowingly planned for a percentage of overtime as a substitution for the addition of manpower that had a foreseeable demand. (Tr. 5144). If the workload increased, because of a shortage of manpower or machines, defendant served the immediate need with overtime and then determined whether the need was permanent; if so, additional people were hired. (Tr. 5145).

This is no correlation between overtime and shipments, because the impact of overtime could be felt in shipments weeks and months ahead. (Tr. 5149–50). Where overtime is spent in assembly and tests or shipping, the effects are usually felt in days; while the same employee, working back in the line might have only a small impact many weeks away.

William E. Diefenderfer was the assistant general manager at Hamilton during 1960; he later became president of the division and is now a vice-president of United Aircraft Corporation. He represented that the strike caused very severe problems and the most severe among them was a parts imbalance situation, where it took time to get things organized before defendant could get back to normalcy. (Tr. 4505). He testified it took longer than 4½ months to get straightened out. (Tr. 4616). "To have simply hired more people would have made our problem worse. We were having trouble managing what we had." (Tr. 4620).

At that time Hamilton was just getting into the production of fuel controls for the General Electric P–585 turbine engine and was having difficulty with one used on the Boeing 727, Hamilton's JFC–60. A new fuel system contract for a Pratt & Whitney engine was also underway and in early 1961 Hamilton was under extreme pressure to get this moving. The problems attendant upon these changes lead to overtime work. (Tr. 4507–08). At the time about 70–75% of the production was for the Government and the remainder for private commercial users. Navy representatives were on duty at the plant at all times, to verify that the equipment being manufactured was in accordance with contract specifications, that deliveries were on time, the pricing audited and the physical product inspected to assure its conformation with engineering drawings and quality. (Tr. 4510–11).

On January 6, 1961, a Hamilton press release indicated that 400 job openings were expected to occur within the next eight weeks and attributed this, to the reinstatement of contracts relating to the North American B–70 bomber, plus stepped up customer requests for other company products. (PX–23, A–L, Tr. 4512). The openings were mostly for skilled machinists and technicians, because there were limited production programs which were just getting under way. (Tr. 4514). In addition, a contract for Hamilton fuel controls for the P&W jet engines powering the Boeing 727 jet transport was obtained after competition with other companies. (Tr. 4515–16).

The preliminary production of a fuel control unit for a new adaption required engineering changes. It required a lot of special skilled work to be done before it could be adapted to mass production tooling. These fuel control units varied from 28 to 100 pounds and contained approximately one thousand precision parts; the price range varied from $4,000 to $80,000 per unit. It was a very precise and sensitive computer designed to read factors relating to engine speed, compressor pressure, exhaust temperature and inlet temperature, so as to compute exactly the fuel requisite of the engine at a given instance and see that it was provided. (Tr. 4519–20).

Another relevant factor in the overall circumstances was that the company had changed the centers and groupings of machines during the strike at Hamilton, so as to provide a more efficient realignment of its production facilities. Manager Diefenderfer stated that there was never any policy of the company to deny strikers the opportunity to get back to work at any time; and he observed no practice which could be so interpreted. (Tr. 4523).

Diefenderfer's testimony tended to confirm that of Gravelin's; that while there were additional reasons, certain new items created a marked demand in the latter part of December 1960 and early January 1961, namely, the controls for the JT8D, the 727 control, the JFC–26, General Electric engine and prop for the J–58 (Tr. 4568). Another business factor was that during the settlement period from September 1960 through December 1960, Hamilton was shipping out work at a rate greater than it was able to make sales (Tr. 4568) so that backlog was generally decreasing. However, this phenomenon alone was not the sole determination of the number of employees required. (Tr. 4580).

Diefenderfer represented that the reason why everyone could not come back was because of the disruption of the shop. Some parts were in short supply, others were adequate; outside sub-contracts offset some deficiencies. The myriad of complex interrelated parts were running ahead of the abilities of the production control system which was designed to bring order. (Tr. 4583). There was never any conscious design or motive on the part of Hamilton management to depress the complement until after January 1, 1961, when the preferred hiring list expired by contract. (Tr. 4584). In fact overtime was materially higher in 1961 than it was in 1960. (Tr. 4585). He pointed out that overtime in December 1961, a comparative monthly period, was considerably higher than the same period in 1960 which is now the subject of controversy.

Overtime is generally used when the same team of experienced personnel are working on a problem part and where lesser experience with it would not suffice; or if the need is short-lived, it is better to keep people on than to hire and fire. He denied ever being present at any discussion of management during executive meetings, concerning any policy to depress the complement until after December 31, 1960. (Tr. 4587). Neither was there any discussion about delaying the hiring so as to avoid recalling people who were poor workers or who were distasteful or troublesome. He explained that short term overtime, accomplished in terms of weeks or months, is governed by the experience of the employees required, the availability of tooling, and special skills (Tr. 4598). He claimed it was better to work with a smaller force and try to get things turned around and make some progress in straightening the company out in order to satisfy customer needs; this was the only objective he claims he had at the time. (Tr. 4599–4600). He explained that the defendant was "trying to get a few pieces through to get this massive affair of ours, with these tens of thousands of parts, going again and literally, the more we got into it, it was more like pushing into a ball of cotton-wool." (Tr. 4601).

During the period September through December at Hamilton, shipments were going out faster than new orders were coming in and backlog was progressively decreasing. That in itself would be a restraining influence on new hiring. (Tr. 4607). The control for the JT8D engine and the three complex controls for the J–58 engine were items that required a great many skilled people. This was the basis together with other projects coming along, that caused them to get specially skilled people into that area. (Tr. 4608–9, 4614–15).

At Pratt & Whitney, in August of 1960, Smith, the assistant general manager, had worked out an agreement with the Government on the number of en-

gines scheduled for delivery during the remainder of 1960. (PX–164, DX–64). This schedule also included scheduled deliveries for commercial customers. The earlier February (DX–62) and May (DX–63) schedules had been based on the presumption that no strike would occur; the August 16, 1960 revision recognized the strike problems. (Tr. 6646–47). The engines scheduled were of varying types and priced between $150,000 and $200,000 each. (Tr. 6655).

| Scheduled Deliveries (August 16, 1960) | | Actual Deliveries | |
|---|---|---|---|
| August | – 78 | August | – 84 |
| September | – 142 | September | – 149 |
| October | – 190 | October | – 176 |
| November | – 207 | November | – 182 |
| December | – 204 | December | – 195 (Tr. 6649). |

Smith explained that during the strike, defendant exerted special effort to get out as much of the product that was near the end of the production line as possible in order to maintain a maximum number of engine deliveries as long as possible. To accomplish this, parts and material in process were pulled out of the production line to meet use demands and this activity dried up operations at the beginning or middle of the production line sequence. The ability to recover was paced by defendant's ability to re-establish a normal flow of material. (Tr. 6650).

During the last four months of 1960 because of material shortages, considerable overtime was worked in the assembly and test department. Smith asserted that to bring back more people would not have increased production of the end product (engines) as would working with the available material and machines seven days per week, 24 hours per day. (Tr. 6651, 6664). At least 90% of the overtime was on Saturday and Sunday. Smith explained that if you tried to bring in people for only two days a week instead of using the regular shift personnel, they would not have had the necessary skills. (Tr. 6653).

The lead time on some parts is seven or eight months. There were some places in the production line where parts inventory was exhausted, because material was drawn out to further operations during the strike. (Tr. 6654–55). While 821 engines were scheduled for delivery by the defendant between August 1960 and December 31, 1960, 786 were delivered, which was 35 less than defendant had planned. Smith stated that considering the fact that each unit sold for approximately $175,000, the defendant most certainly would have delivered these 35 engines if it possibly could have. (Tr. 6656). During this period, the defendant started actual production of the fan-type engine for both military and commercial usage. This was a new model and although engineering had started on it in 1957, it bogged down because of unexpected production difficulties. (Tr. 6657, 6658, 6661–63). Smith claimed defendant did everything it thought was possible to meet its schedules. (Tr. 6676). He knew of no plan or policy to avoid taking back strikers. (Tr. 6677). The 6.1% overtime premium in October 1959 was higher than the 5.8% premium in October 1960, during the controversial settlement period. November 1959 shows 6.9%, November 1960 was 8.7%. The December figure of 1959 was 6% and the December figure for 1960 was 6.6%. (PX–229, PX–302; Tr. 8445, 8451). The fourth quarter of 1959 indicates an overtime premium of 6.3% as against the comparable quarter of 1960 of 7%; a difference of only seven tenths of one per cent. (Tr. 8449, 8452). An

analysis of the total labor cumulative ratio of variances for the fourth quarter of 1959 was 54.5 as against 53.0 for the same period in 1960. (Tr. 8452). When plaintiffs' counsel was inquired of by the Court concerning this statistical similarity he could point with no persuasive significance to this data. (Tr. 8454).

The plaintiffs do not compare total overtime in each year per se, but rather the ratio of the standard hours worked to the overtime worked for the entire year, namely 5.20–1 for 1960 and 6.48–1 for 1961. However, such a presentation then brings into issue a comparison of the size of the total working complement for the periods which are compared, together with a multitude of other related factors.

The plaintiffs point to the minutes of the operating committees' meetings on August 15, 1960, and September 19, 1960, as proving the defendant's planned intention to depress the work complement. (PX–255(a), p. 1, para. 2; PX–255(b), p. 1, para. 3; PX–256(b), p. 3, paras. 2 and 3). In weighing the significance and overall relevancy of these summary reports, it must be borne in mind that a nine week strike had just concluded, which involved a substantial number of employees. The defendant claimed to have lost $15,000,000 as a direct result of this economic upheaval. (Tr. 9587). The management of this corporation was responsible to the absentee owners (the stockholders) to earn a maximum net profit during the fiscal year. Admonitions by management to keep within the operating budget and review expenses, while at the same time maintaining maximum shipments throughout the remainder of the year is not inconsistent with necessary management planning required of successful business executives, to produce corporate profits.

"(S)ince fewer employees were needed to operate the plant(s), the respondent had the right to exercise a choice between efficiency and inefficiency." NLRB v. Bell Oil & Gas Co., 98 F.2d 405, 409, (5th Cir. 1938).

While plaintiffs might argue that the defendant's primary, if not sole motivation should have been the prompt restoration to the payroll of all possible registered strikers by September 1, 1960, it must be realistically recognized that this was not the measure of its duty; the defendant was only required to exercise good faith in its management decisions relating to the restoration of the bargaining unit. Personnel Manager Mooney represented that Vice-President Burke's instructions to both divisions was to get operations back to normal as quickly as possible. (Tr. 3141–42, 9532–35). The defendant did not even promise to restore all registered strikers prior to January 1, 1961. On the contrary, it was mutually contemplated that all registered strikers would not be restored, because the agreement established the cut off date of December 31, 1960, for those entitled to receive vacation pay; and it established that date as a limitation on contractual preferential hiring rights.

In order to more realistically portray the defendant-company's recall problem in the post strike period, a comparative statistical analysis by division and section is superior to utilizing the plant wide figures. The following table sets forth the pre-strike complement on June 7, 1960; the complement on August 8, 1960 at the end of the strike; and a computation of the possible job openings against the number of registered strikers seeking a return to their former jobs. It will also show the job population trends through December 31, 1960 and thence to May 1, 1961. (DX–49, DX–3).

| | 6/7/60 | 8/8/60 | Possible job openings at strike's end | Registered strikers seeking jobs | 1/1/61 | 5/1/61 |
|---|---|---|---|---|---|---|
| Machine Shop — Made and worked parts for engines | 4820 | 4668 | 152 | 1296 | 4909 | 5580 |
| Materials — New materials or parts received and final products shipped | 1451 | 1251 | 200 | 308 | 1272 | 1313 |
| Master Mechanics — Made and/or repaired and maintained tools and machines used in manufacturing | 1298 | 891 | 407 | 417 | 1200 | 1224 |
| Plant Engineering — Maintained, cleaned and repaired plant and supplied heat | 1452 | 1242 | 210 | 391 | 1303 | 1389 |
| Assembly & Test — Assembled and tested engines. | 1281 | 873 | 408 | 434 | 1032 | 1155 |
| Semi-Production — Specialized products | 1098 | 861 | 237 | 387 | 924 | 986 |
| Miscellaneous — Tool cribs | 359 | 323 | 36 | 87 | 329 | 350 |
| | 11759 | 10109 | 1650 | 3320 | 10969 | 11997 |

These statistics disclose that at Pratt & Whitney there were twice the number of registered strikers seeking recall, as there were possible job openings at the end of the strike. When one looks at the Machine Shop, it becomes glaringly apparent that there were 1,296 registered strikers applying for 152 potential job openings. Notwithstanding this unbalanced ratio of limited job openings at the strike's termination, the defendant did return 1,115 to work in the Machine Shop prior to January 1, 1961 under the terms of the Recall Agreement; 858 re-

turned to their pre-strike jobs and 257 to other jobs. (DX–49, DX–3). Further emphasis on these disjointed imbalances is indicated when one analyzes departments within these sections, such as in Plant Engineering, where there were 33 employees working in Department 21 (Painters) when the strike began, there were the same number when the strike ended, yet there were 8 registered strikers awaiting recall.

In Assembly and Test only 223 of the 434 registered strikers were returned to work before December 31, 1960, a situation strongly emphasized by plaintiffs. It is of significance to note, that it was in this section that the complement had been overpopulated just prior to the commencement of the strike and there had been two layoffs in May 1960 in excess of 10%. The company had contemplated there would be further reductions in this section. (Tr. 6333). The recall of the lesser number into this section was also due to the unavailability of parts and complete engine assemblies which otherwise might have warranted increased personnel. (Tr. 6649–58).

Defendant's Exhibit 49 discloses that there were 1,281 employees in Assembly & Test when the strike began, 1,032 at the end of 1960, and 1,155 by May 1, 1961. Defendant's Exhibit 3 discloses that 60 strikers and one non-striker were hired in January 1961; 14 strikers and 25 non-strikers in February 1961; 6 strikers and 28 non-strikers in March 1961, and 13 non-strikers in April 1961. It does not seem reasonable to infer, as the plaintiffs would have the Court do, that the defendant would re-hire 1,274 strikers in its Machine Shop and Quality Control (final inspection (Tr. 6336)) so as to effect a restoration of its ability to produce its end product and at the same time deliberately discriminate against Assembly and Test by refraining from recall 211 strikers in that division, thus diminishing its ability to ship completed engines and receive the profit benefits of its overall production efforts.

A similar analysis will disclose in a summary manner the job population trends in relevant divisions at Hamilton's Windsor Locks plant from June 7, 1960 through May 1, 1961. (DX–2).

## Manufacturing Division

| | 6/7/60 | 8/10/60 | 10/1/60 | 1/1/61 | 5/1/61 |
|---|---|---|---|---|---|
| Propellers, etc. | 1518 | 1016 | 1265 | 1232 | 1230 |
| Fuel controls | 698 | 479 | 645 | 659 | 976 |
| Overhaul & repair | 512 | 314 | 329 | 317 | 313 |
| Electronic beam (new division) | 4 | 8 | 9 | 15 | 22 |
| Ground support | 18 | 19 | 26 | 31 | 49 |
| Sheet metal fabrication | 136 | 80 | 144 | 148 | 152 |
| | 2886 | 1916 | 2418 | 2402 | 2742 |

There was only one significant sub-division increase which occurred subsequent to December 31, 1960. This increase in the Fuel Controls sub-division between January 1, 1961 and May 1, 1961 was the result of Hamilton's receipt of a pilot order December 21, 1960 (dated December 16, 1960) requesting fuel control units for the Boeing 747 jets. While the original order involved only eight fuel controls, this was the forerunner of anticipated orders. (Tr. 4515–21).

| | Experimental Division | | | | |
|---|---|---|---|---|---|
| | 6/7/60 | 8/10/60 | 10/1/60 | 1/1/61 | 5/1/61 |
| Experimental mfg. (propellers) | 154 | 94 | 149 | 150 | 167 |
| Experimental mfg. (fuel control) | 228 | 138 | 202 | 196 | 198 |
| Experimental test | 227 | 185 | 205 | 198 | 212 |
| Vibration & measurement | 44 | 22 | 35 | 36 | 36 |
| Materials Engineering | 43 | 45 | 43 | 43 | 42 |
| | 696 | 484 | 634 | 623 | 655 |

This table indicates that the employee population remained relatively constant from October 1, 1960 to May 1, 1961.

Hamilton's Broad Brook plant during the pre-strike period in 1960, had approximately 405 employees in the complement. Of this number, about 37 were in areas related to the support of the manufacturing operations and 33 in the machinery department. The remaining personnel were engaged directly in the assembly of items for production. The table following summarizes the job population trends from June 7, 1960 to May 1, 1961. It also demonstrates the problems faced at the conclusion of the strike with a far greater number of registered strikers (R/S) than possible job openings (P/J/O). (DX–26A).

| | 6/7/60 | 8/10/60 | P/J/O | R/S | 1/1/61 | 5/1/61 |
|---|---|---|---|---|---|---|
| **Support** | | | | | | |
| Receiving & stores | 4 | 3 | 1 | 3 | 3 | 3 |
| Finished stores & dispatching | 5 | 4 | 1 | 3 | 3 | 6 |
| Shipping | 4 | 4 | 0 | 0 | 3 | 5 |
| Plant maintenance | 17 | 15 | 2 | 6 | 17 | 15 |
| Electrical maintenance | 3 | 3 | 0 | 2 | 2 | 2 |
| Power house | 4 | 4 | 0 | 0 | 4 | 4 |
| | 37 | 33 | 4 | 14 | 32 | 35 |
| **Assembly** | | | | | | |
| Inspection | 41 | 32 | 9 | 36 | 34 | 31 |
| Assembly & test | 206 | 139 | 67 | 168 | 167 | 222 |
| Master crib | 4 | 3 | 1 | 4 | 3 | 3 |
| Electronic experimental | 31 | 12 | 19 | 20 | 12 | 13 |
| Electronic fabrication | 7 | 5 | 2 | 3 | 7 | 7 |
| Electronic laboratory | 37 | 31 | 6 | 15 | 38 | 39 |
| Electronic test | 9 | 0 | 9 | 9 | 0 | 0 |
| | 335 | 222 | 113 | 255 | 261 | 315 |
| Machinery | 33 | 3 | 30 | 31 | 15 | 18 |

The Strike Settlement Agreements carried with them an implied obligation of mutual good faith and fair dealing in their execution; and labor law policy infused an additional element, namely, that strikers could not be discriminated against in the administration of the recall provisions of the contract. The implied promise in this instance also carried with it the defendant's exercise of good faith in the continuance of its business "in the usual manner," insofar as economic circumstances would permit.

> "The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. See Shulman, Reason, Contract, and Law in Labor Relations, 68 Harv.L.Rev. 999, 1004–1005. The collective agreement covers the whole employment relationship. It calls into being a new common law— the common law of a particular industry or of a particular plant." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578–579, 80 S.Ct. 1347, 1351 4 L.Ed.2d 1409 (1960).

See, Line Drivers Local 961, of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. W. J. Digby, Inc., 341 F.2d 1016, 1019 (10th Cir. 1965); Cox, the Legal Nature of Collective Bargaining Agreements, 57 Mich.L.Rev. 1 (1958).

Threaded throughout the relationship of the parties during the settlement period is the clear indication that a considerable degree of mutual trust and cooperation remained between the company and the union at the higher professional levels. Union General Counsel Papps wrote to President Hayes of the International Union as late as October 28, 1960, recommending that the remaining 32 cases of the original 50 submitted to arbitration, should be withdrawn from the judicial arbitration panel. He expressed the belief that the union members who had been charged with strike misconduct would fair better from a decision by the company officials, Mooney and Burke, than they would with the panel of State Supreme Court judges. (DX–17, Tr. 9005). A similar attitude of trust was expressed in Burke's testimony, when he stated that on two occasions he had made an offer to President Hayes, that the latter retain a New York accounting firm to review the defendant's personnel records, and if it were found that the company had discriminated against anybody, it would reimburse them for full back pay. Hayes declined and stated that he would take Burke's word for it. (Tr. 9596–99).

■ The Court finds after considering the totality of the circumstances, that the plaintiffs have failed to prove their allegations that the defendant, or either of its subsidiaries, deliberately and in bad faith depressed the bargaining unit during the life of the Settlement Agreements through December 31, 1960 or that it failed to exercise good faith in the performance of the Strike Settlement Agreements to avoid its contractual obligations. While the plaintiffs placed this question in issue by a prima facie showing, the defendant assumed its burden of going forward and advanced proof [13] which satisfied the Court, that it had acted in good faith and was motivated by legitimate and substantial business justification in the performance of its obligations under the Strike Settlement Agreements.

> "Frequently a strike affects the level of production and the number of jobs. It is entirely normal for striking employees to apply for reinstatement immediately after the end of the strike and before full production is resumed. If and when a job for which the striker is qualified becomes available, he is

---

13. See e. g., DX–2; DX–2(A); DX–2 (B–1–3); DX–2(C–1–3); DX–2(D–1–5); DX–2(E–1–3); DX–3; DX–3(A); DX–3(B–1–9); DX–3(C–1–7); DX–3(D–1–24); DX–3(E–1–3); DX–3(F); DX–26(A); DX–26(B); DX–27(A); DX–27(B); DX–49; DX–49(A–F).

entitled to an offer of reinstatement. The right can be defeated only if the employer can show 'legitimate and substantial business justifications.'" NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967).

"(T)he employer may counter by claiming that his actions were taken in the pursuit of legitimate business ends and that his dominant purpose was not to discriminate or to invade union rights but to accomplish business objectives acceptable under the Act. * * * As is not uncommon in human experience, such situations present a complex of motives and preferring one motive to another is in reality the far more delicate task, reflected in part in decisions of this Court, of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct." NLRB v. Erie Resistor Corp., 373 U.S. 221, 228–229, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963).

Also see, Quality Castings Co. v. NLRB, 325 F.2d 36, 40 (6th Cir. 1963).

## TRANSFERS, PROMOTIONS & DEMOTIONS

Plaintiffs' claims on this issue were multiple and diverse: (1) those promoted or transferred during the strike were not permanent replacements for strikers, but were additions to the complement in the jobs affected; (2) that many promotions, demotions and transfers were made between August 1, 1960 and August 8, 1960 in contemplation of the strike's end and contrived to defeat the agreements; (3) that promotions, demotions, and transfers were made during the period of the Strike Settlement Agreements, so as to deny registered strikers on the preferred hiring list the right to recall.[14]

The defendant's position on this issue is that during the "actual strike period" no labor agreements existed since the prior ones had expired, and therefore it had the right to transfer, promote and demote at will, consistent with its employment needs, even to cross occupational code, department, seniority area lines (Tr. 3118–19); and that it did in fact do just that. However, thereafter during the "settlement period," it was entitled without qualification to transfer, promote or demote an active employee from the job he was performing to another job, provided it was within the same occupational code and seniority area; and this was true even though there were more senior employees on the preferred hiring lists who could have performed the job (and at Hamilton had the demonstrated ability to perform the job) to which the junior employee was transferred, promoted or demoted. Defendant claimed that its rights were the same as when it had men out on layoff and that these practices had been in effect for twenty years in the layoff situation. (Tr. 4974, 6149–53, 9590–92, 9280).

The defendant stipulated and admitted that it had made transfers during the settlement period and had made promotions and demotions, but only within the same occupational code and seniority area, both of strikers and non-strikers, believing it had the right to do so, just as had been the practice during previous periods of layoffs. (Tr. 4711–12, 4120, 6124). It represented that if it had been barred from making these transfers, whether they were promotional, lateral, or demotions, the defendant would have been faced with the problem of recalling registered strikers from the preferred hiring lists and ending up with more employees than it had work for or, in the alternative, laying off people who

---

14. PX–371—Plaintiffs claimed 387 blocking transfers varying in their duration effects from entire settlement period to minimal periods. (Tr. 9623).

were already on the payroll. (Tr. 4338–39, 9503; see also Tr. 4128).

The defendant maintained that the historical precedent between the parties in the layoff situation, as well as the wordage of the Agreements, obligated it to use the preferred hiring lists only before new employees were hired; and if the Court were to interpret and apply the Agreements otherwise, it would in fact be rewriting the contract in accordance with its own subjective theories of industrial management and employee relations and not as the parties had agreed in their settlement contracts.

As to the first two categories, which relate to the actual nine-week strike period, the Court has no problem. The defendant did have the absolute right to transfer and promote into permanent positions, in the same manner that it hired new permanent employees into the complement during this period. The mere fact that some of these changes occurred during the week preceding the strike settlement is irrelevant. At that time, there existed neither labor contracts nor settlement agreements and until they were subsequently ratified by the membership, no one knew with certainty whether either contract would ever be agreed upon.

Transfers and promotions from date of origin for which the record paper work had been commenced and was in process on or before August 8, 1960 (in the case of Hamilton) and August 9, 1960 (in the case of Pratt & Whitney) were valid, even though a change of status slip had not been fully processed and the effective date actually accrued after the settlement ratification. (Tr. 9203–04). This paper work sometimes took up to two weeks to process. In particular, this was normal, where a vacation period intervened, as had occurred during the month of August in this instance. (Tr. 9265).

Paragraph 4(c) of the Pratt & Whitney Strike Settlement Agreement provided that where no job was available under paragraph 4(a) and 4(b) the striker's name would go on the preferred hiring list and he would be recalled to job openings in their occupational groups and seniority areas which developed prior to January 1, 1961, *before new employees were hired.* It provided that the strikers would be recalled to such job openings in the order of their seniority pursuant to Article VII §§ 1 and 2. The Hamilton Strike Settlement Agreement was substantially the same except that the recall priority provisions were subject to seniority and demonstrated ability, as referred to in the labor contract, which was incorporated in the Settlement Agreement by reference.

Defendant's Exhibit 34 (Hamilton) and defendant's Exhibit 45 (Pratt & Whitney) (Tr. 5498–5501) spell out the general ground rules which the defendant applied in filling available jobs under paragraph 4(c), (so-called phase (3)). It established the guiding principle that the most senior active employee, who held the same job (job code, department and shift) at the time of the strike, but who had returned to a different job at the end of the strike would be offered the opening first; the defendant considered its first obligation to be the "making whole," those active employees who had not yet been returned to their former status. (Tr. 4765, 5372, 5936). If this procedure was not feasible, defendant would then consider filling the job opening by the transfer of another qualified employee. Only after the exhaustion of these sources, did the preferred hiring list come into play in the defendant's administration of the Strike Settlement Agreements.

The plaintiff-unions' posture is that these procedures violated the Strike Settlement Agreements, as properly construed. (See also, Tr. 4907–08). It emphasized that the promotion or transfer of active employees who were at work in the plant, in preference to those inactive employees awaiting recall on the preferred hiring lists was an attempt to grant an unlawful preference and divide the strikers. (Tr. 7960–61). However, the defendant pointed to the Settlement

Agreements which contained no restrictions against transfers or promotions, except as applicable in a layoff situation, where employees with recall rights were entitled to preference only before new employees were hired.

The basic controversy centers on whether the defendant could legally establish procedures comparable to those used in a layoff situation in administering the Strike Settlement Agreements. Paragraph 4(b) of the Pratt & Whitney agreement explicitly provides that the "strikers will be treated as if they had been laid off." The Hamilton paragraph 4(b) does not include this language, but as discussed above, the parties intended it to have the same meaning as the Pratt & Whitney agreement. (See pages 47–48 *supra*).

The plaintiffs claim that it was orally agreed that all registered strikers would continue to accumulate seniority up to September 1, 1960; and that this meant that they would not be considered to be inactive and laid off until that date. They contend that between the end of the strike, August 11, 1960, and September 1, 1960, the defendant discriminated against the strikers by treating them as if they were inactive, insofar as recall rights were concerned.

Actually all those who returned before the strike ended lost no continuity of their weeks of seniority because of their having been out on strike. In similar manner, the defendant agreed that the continuity of the seniority record of registered strikers would not be affected in any way, by the fact that they had gone on strike, provided they were returned to work on or before September 1, 1960. (Tr. 2997–98, 3116–25, 5496). This provision did not in any manner change the basic meaning of paragraphs 4(a) and 4(b), in either Settlement Agreement which was to treat the strikers as laid off. It simply guaranteed to the registered strikers, for seniority purposes only, that if they were recalled by September 1, 1960, they would not lose any seniority. It was actually indica-

tive of a fair and generous attitude by the defendant toward the affected employees. The registered strikers did in fact compete for available jobs during this period pursuant to paragraphs 4(a) and 4(b) of the Agreements, and the contracts were not violated in this respect.

From the language of paragraph 4(c), the defendant might well argue that the *only* restriction on the company was to recall strikers "before new employees were hired." Such an interpretation would leave the registered strikers without any of the protections accorded by the collective bargaining agreements. However, as indicated above, the company administered paragraph 4(c) as if the layoff provisions of the labor contracts did apply and such an interpretation is consistent with the spirit of the Agreements. But it certainly cannot be persuasively argued that the written provisions of paragraph 4(c) gave the registered strikers greater rights than they were accorded by the layoff provisions in the labor contracts.

The plaintiffs suggest that the dicta contained in a prior arbitration award (DX–21) supports their position. The relevant part states, "It was conceded by the company that if the transferred employee had less seniority in the department than employees on layoff from the department, the transfer would create a justifiable grievance." (at pp. 11–12). The arbitration dispute from which the quote is taken involved a different issue than that which exists here. It concerned a transfer which crossed over from one occupational code and seniority area into another; in such an instance seniority in the transferee might exist over employees awaiting recall on the layoff list. In the present case, however, we are concerned primarily with transfers within the same occupational code and seniority area; and no grievance or claim is made in the arbitration award referred to, that any irregularity or preference existed under the Hamilton labor contract, between active employees transferred within the same occupational code and seniority area. In fact that arbitra-

tion award in referring to such laid-off employee states:

"They first must be offered employment in the given department in accordance with their seniority and demonstrated ability 'before new employees are hired.' It contains no restriction upon the transfer circumstances of a layoff. The union has shown that this could frustrate seniority rights of an employee on layoff. The Arbitrator, nonetheless, cannot ignore Section 3 and add to the expressed limitations to provide greater protection to the employee on recall." (DX–21, p. 15).

These interlocking agreements were prepared by the defendant and must be construed to effect the intent of the parties; however, wherever ambiguity exists it should be construed against the drawer of the agreement. This Court may not add to the contracts' wordage. The language used is not subtle, misleading or ambiguous.

"If the language used is plain and unambiguous, it must be given its natural and ordinary meaning. * * * The effect of the contract must be determined by the intent expressed in it and not by an extraneous intent which may be claimed or believed to have been in the minds of the parties." Leathermode Sportswear, Inc. v. Liberty Mutual Ins. Co., 150 Conn. 63, 66, 186 A.2d 79, 81 (1962).

See also, 17 Am.Jur.2d, Contracts, §§ 241, 245.

Under the wordage of the Settlement Agreements the labor contracts and the supplemental agreements relating to management's reserved prerogatives in the "Witnesseth Clause," the defendant had the lawful right under the Pratt & Whitney and Hamilton contracts to make demotions and lateral transfers within the same occupational code and seniority area, without being required to recall from the preferred hiring list. As a practical matter, such elasticity in complement movement within the same occupational code and seniority area has always been considered by the defendant in its past dealings to have been essential to efficient operation. Otherwise the defendant might have been required to layoff unneeded active employees, while at the same time recalling others from the preferred hiring list to the same occupational code and seniority area or carrying the temporarily unneeded surplus help as an extra expense. (Tr. 4338, 9503). Vandervoort claimed it was well known to the unions, at least at Hamilton, that transfers and promotions were not stopped or barred by the Settlement Agreements. In fact the union president was such a transferee himself (Tr. 4333–34, 4120) and no complaint was made. (Tr. 4974–76, 4199).

The Recall Agreements provided no guarantee that all registered strikers would be returned to work before January 1, 1961. On the contrary, it expressly provided in both agreements that those not recalled by that date would lose all further contractual preference. Unless the phrase "before new employees are hired" which appears in paragraph 4(c) is to be declared a nullity and meaningless, it must be interpreted to modify and limit the contract words, "Strikers * * * will be recalled to job openings which develop * * * before new employees are hired." Thus, before the company can hire from outside the plants, it must recall from the preferred hiring list, pursuant to the seniority terms of the collective bargaining contract.

While this agreement may appear to be somewhat harsh and unfair, from the point of view of protecting the senior registered strikers who were adversely protected, nevertheless, the Court is bound by the written contract. It has not been asked to reform it, nor does it have the right to rewrite its agreed terms in a manner to suit the Court's own sense of what could or might have been incorporated within it.

Plaintiffs argue that the requirements of federal labor law policy as exemplified in NLRB v. Fleetwood, *supra,* and NLRB v. Erie Resistor, *supra,* have en-

larged the rights of the regular strikers under the Agreements so that the company's procedure of transferring employees was invalid. The Strike Settlement Agreements in this instance anticipated *Fleetwood's* requirement of establishing what was tantamount to a preferred hiring list. And furthermore, defendant's utilization of this list conformed to *Fleetwood's* philosophy that strikers be given recall preference over strangers. Nor can it be claimed that *Erie Resistor's* bar against a plan which would discriminatorily set off strikers from non-strikers was violated here. Under the terms of the Strike Settlement Agreements both non-strikers and the several thousand strikers returned to the active complement were treated equally and identically. The transferees were both strikers and non-strikers. The teachings of *Erie Resistor* never contemplated prohibiting an employer from meeting his personnel requirements within the terms of the prevailing collective bargaining contracts.

It is important to note that plaintiffs' claim that the Settlement Agreements were intended to expand their rights under federal law is not valid. Paragraph 4(a) met all the requirements of federal law as it had been interpreted through 1960. Thus paragraphs 4(b) and 4(c) substantially expanded the strikers' rights.

Thus the Court does not need to consider the question whether the Strike Settlement Agreements, negotiated by competent equals, waived rights under federal law; a question left open in *Fleetwood*, 389 U.S. 381 n. 8, 88 S.Ct. 543. Nor need the Court consider whether, on the facts of this case where the company in good faith substantially exceeded the existing requirements of the law,

subsequent changes in the law should be retroactively applied.

Based upon precedent and the historical dealings between the parties, only in those instances where it can be shown that transfers in fact were made across occupational code and seniority area lines, to the prejudice of employees on the preferred hiring lists who retained seniority status, can it be validly claimed that the preference was in violation of the Settlement Agreements and Article VII of the labor contracts. (Tr. 3568–69, 3792–94, 6124). In any such instance, a senior employee on the preferred hiring list, who was so prejudiced, would be entitled to be restored to his rightful position and reimbursed for his actual damages.

Under Article VII § 1(a) of the Pratt & Whitney labor contract, employees were to be laid off and recalled by non-interchangeable occupational groups within specified seniority areas in accordance with seniority. There was no restriction on lateral transfers or demotions within the same seniority areas. It was common custom for the employer to demote or change the status of shifts. Generally the less senior people would end up by being bumped downward into a lower labor grade as the labor complement became restricted and the deeper the layoff the more heavily would be the invasion of the lower grades by this bumping technique. (Tr. 5379–81). In inverse order, as the complement was recalled back to work and a broader scope of higher rated jobs were needed to do the work, those with higher seniority at Pratt & Whitney and those with higher seniority and demonstrated ability at Hamilton, in their respective seniority areas were recalled.[15]

Under normal layoff conditions, procedures generally operated so that em-

---

15. In the case of a layoff at Hamilton there was no automatic way to determine whether your seniority would protect you from layoff; seniority and demonstrated ability were both factors to be considered. (Tr. 1861). The mere fact that an employee had more seniority would not protect him from layoff, if the retained employee had experience on the particular work; that is, demonstrated ability to do the particular work. Retention lists centered around that principle. The union checked to determine whether or not the senior laid off employee had ever performed the work that the person retained performed. (Tr. 1862).

ployees who had greater seniority were the last to be laid off. Thus even where lateral transfers or demotions were made to lesser grades during layoff periods, the most senior employees still remained actively employed in their respective seniority areas, although at a lower job grade. As recalls were subsequently made to increase the complement, transfers and promotions were in order to restore the demoted employees from their lesser grades to their former status. The defendant-company insists that this was the intended procedure in the administration of the contracts, except that the preferred hiring lists became a factor only before additional help from outside the plant was to be considered for employment.

An overall consideration of the contracts does not support the defendant's position in two categories, waivers and promotions. Whenever a registered striker was sought from the preferred hiring list and offered employment in a job-grade less than that which he held before the strike, but in his occupational code and seniority area, as the Agreements required, the defendant permitted him to sign a waiver indicating his election to wait for the vacancy in his former job grade, providing it occurred before January 1, 1961. (PX–56, PX–57; Tr. 1988, 4800). In such event, the next less-senior registered striker was offered the job opportunity. If the latter accepted, he became an active member of the complement; and when the higher job grade opening in his pre-strike job subsequently became available, the defendant, regarding its primary obligation to be the "making whole" a senior "active" employee (DX–34) promoted him to his former status (Tr. 5372), which job in some instances was the original job held by the more senior employee who had signed the waiver. This action was not wholly regarded by the defendant as a promotion, but simply as a restoration to the job which he formerly occupied.

This type of preference to the active employee, constituted an unlawful discrimination and administrative breach of the Settlement Agreements. This also applied to any transfer of a less senior employee into the old job (same job code, department and shift) of a striker who had signed a waiver. The defendant had by its administration of the Agreements introduced a new element into the contracts, when it formulated the waiver procedure. It was assented to by the individual registered striker upon his execution of the waiver. (PX–56). In so doing, the latter elected to await a vacancy in his former pre-strike job, where he held conceded seniority. He had every right to expect the defendant would recall him to his former job (same job code, department and shift) when it became available; particularly when the evidence does not demonstrate, that it was fully disclosed to him that his waiver, as a matter of administrative practice, would permit the defendant to restore a less senior active employee to his job, when it did open up and become available. The defendant's subsequent filling of this job by a transfer of an active employee, in preference to the inactive employee on waiver who had the greater seniority was discriminatory and violated the lawful administration and spirit of the Agreements.

"(W)hen an employer promises to rehire striking employees as soon as their positions again become available, he may not discriminatorily violate this undertaking." NLRB v. Roure-Dupont Mfg., Inc., 199 F.2d 631, 633 (2d Cir. 1952).

The specific number of transfers which blocked more senior people who had signed waivers and their individual identity was not offered as evidence in any Court exhibit. Unless counsel can stipulate to the identity of the persons affected, a special hearing will be necessary, either before this Court or before a Special Master appointed by the Court, to ascertain the people who were prejudiced and the amount of damages to which each may prove he is entitled.

Conceding that the "Witnesseth Clause" of the labor contract did reserve

to management the right to make promotions and the historical labor relations of the parties during the lay-off supports that practice, it must be borne in mind that, except for the special retention procedures at Hamilton, the general circumstances of layoff resulted in the retention of the most senior employees in the active complement. Thus, as previously stated, any transfer for promotion of those most senior remaining at work, could not harm seniority-wise those still awaiting recall. However, during the post-strike settlement period, it was a different situation. There were many on the preferred hiring lists, who enjoyed greater seniority than those in the active work complement. Thus, whenever the defendant-employer promoted an active employee into a vacant job without regard to those who had greater seniority in the same occupational group and seniority area, it was doing violence to the spirit of Sections 7(b) and 8(b) of the Hamilton and Pratt & Whitney labor contracts, respectively. The provisions of each section state:

"No employee shall be eligible by reason of his seniority to be transferred to a higher-rated job as a result of lay-off."

Since the letter and spirit of the Settlement Agreements was to treat those on the preferred hiring list awaiting recall as if they had been laid off, those promotions made during the settlement period, which did violence to the seniority of those on the preferred hiring list constituted an unlawful preference of the active employees. If it had not been considered to be a violation of seniority, such a promotion would not have been restricted in the labor contract. The Court's finding applies whether the promotee was a non-striker or a returned striker. (Tr. 7937, 6978).

According to the defendant's own exhibit, (DX–78) 35 of the alleged blocking transfers were promotions to jobs where 121 registered strikers were awaiting recall to work from the preferred hiring list. (Tr. 9206–8). Of the 121, 50 were recalled in 1960 and 33 in 1961.

(Tr. 9213). Four of these two in job code 311–1–5 and two in job code 311–11–6 were promotions which originated on August 8, 1960 and made effective August 15, 1960. The latter date was the following Monday, which was customary procedure, in order to conform to the commencement of a new payroll period. Since the origin of these four promotions occurred on the last day of the actual strike period, the Court finds that these specific promotions were valid. While it may be argued that the defendant did this in anticipation of the settlement, it is equally plausible to claim that since the Pratt & Whitney membership originally voted down the settlement proposal August 7, 1960, it was not likely that Hamilton's membership would act contrary, or that the Pratt & Whitney membership would subsequently reverse its position on August 9, 1960.

One promotion in job code 219–19–5 and four in job code 3–302–5 were originated on August 11, 1960 and August 19, 1960, respectively, to correct classifications so that the record would correctly reflect the work the employees were actually doing. Since this originated subsequent to the Settlement Agreements, the Court will consider these promotions to be unlawful as a preference over senior registered strikers awaiting recall, unless at a subsequent hearing in damages, the defendant can satisfy the Court by tangible evidence that the record promotion was in fact but a clerical correction.

The remaining 26 promotees were promotions from one job to another in the same seniority area. While the defendant claims this latter group simply reflects normal advancement of employees at work, several indicate the jumping of one or more labor grades. When these promotions were made, there were 121 registered strikers awaiting recall into these positions (DX–78), some of whom enjoyed greater seniority than the promotees. The identity of the specific registered strikers affected and the actual damages, if any, to which each such person may prove he is entitled, shall be reserved until the hearing in damages.

## SUMMER HIRES

The issue to be resolved here is whether the defendant's "summer hires" were "temporary replacements" for strikers notwithstanding the employer's personnel department's use of the labeled identification of "temporary hire" for some and "permanent hire" for others. In order to resolve this issue, a perspective of the historical and current use of summer hires by this defendant-employer, is essential.

Prior to the summer of 1960 and since that time, the defendant maintained a summer hiring program; sometimes it was limited to the children of employees, to assist them in their educational expenses (Tr. 6276–77) and at other times it was open to the public. During the past ten years, the defendant did not employ "summer help" during three or four of those years. It was used in part to offset the effect of vacations. (Tr. 6254). During the strike period, in the summer 1960 (Tr. 6277) Morse notified the employment offices at Pratt & Whitney that there would be no summer program that year and all those hired would be classified as permanent. (Tr. 6262–63). The reason advanced was because conditions were too unsettled. (Tr. 5469–70). Unlike those at Pratt & Whitney, the summer hires at Hamilton were classified as temporary help.

The difference in the two personnel classifications actually involved the insurance benefits attributable to each. The temporary employees' classification excluded eligibility for the health insurance program, (Tr. 3542) apparently because of the expected limited duration of employment; while the permanent classification permitted membership in that program. The permanent classification, subject to the 90-day probationary period, also included other benefits, such as retirement, holiday pay and vacation credit, but those do not require comment, because they are not materially relevant to this issue.

Plaintiffs represent that at Pratt & Whitney there were 842 terminations in the late summer and early fall, on which the termination date information indicates that the reason for leaving was educational. (PX–135, Tr. 1958–60). At Hamilton (Windsor Locks) there were 32 such terminations (PX–52; Tr. 1976) and 26 at Broad Brook. (Tr. 1979). Vandervoort, the Hamilton personnel manager, represented that, except for the 30–40 summer hires, all others hired were permanent. (Tr. 3815).

There was no evidence offered by either party to indicate that the number hired into the summer program at either Pratt & Whitney or Hamilton, during 1960, was disproportionate to the numbers hired during a similar period in any prior or subsequent year. Certainly, they were not the same trainees, apprentices and instructors or other non-bargaining unit salaried employees, who were obviously temporarily placed in strikers' jobs specifically as a stop-gap measure to offset manpower shortage while the strike continued.

The defendant's arbitrary personnel record classification alone is not a persuasive determination of the issue. Prior to this year, all employees hired under a summer hiring program, were classified as temporary (Tr. 6273); however, in those years when no summer hiring program was in effect, defendant did hire some applicants as permanent hires, whom it had reason to expect would return to school in the fall. (Tr. 6274, 6261). During the summer of 1960, Pratt & Whitney did hire into the permanent employee classification summer employees whom it had cause to believe would return to school in September. (Tr. 6261, 6277, 6281). They were employed in the customary manner, much as in prior years, except for arbitrary "permanent" classification used at Pratt & Whitney and the usual "temporary" one used at Hamilton.

The real question in issue becomes simply this, is the term "temporary replacement," which is a word of art in labor law, synonymous in meaning with the defendant's use of the labels "perma-

nent and temporary." For if they are truly "temporary replacements" their jobs must be vacated to the strikers, whose jobs they filled at the strike's termination. However, plaintiffs' counsel readily concedes that although they were not in fact permanent replacements, since they were hired for a limited period of time, such as the summer period or until they returned to school, they are entitled to remain in those jobs for that period for which they contracted, but in no instance should this extend beyond September 30, 1960. (Tr. 686–88). Thus, the company was under no obligation to immediately discharge the summer hire replacements to make room for strikers.

> "Employer was justified in refusing to discharge student replacements, upon economic strikers' unconditional offers to return to work, since (1) replacements were hired for definite period, until opening of school term, and (2) they were not hired to break strike but to enable employer to carry on its business." Larkin Coils, Inc., 127 N.L.R.B. 1606, 1613–14, 46 L.R.R.M. 1238 (1960).

Morse represented that it was the defendant's practice during the settlement period to recall a registered striker from the preferred hiring list to any job, which became available as a consequence of an employee's termination. However, the availability of the vacated job was dependent upon the defendant's personnel department's unilateral decision of whether the job could or should be filled from within the active complement, by the transferring of other qualified employees or whether the appointment should be made from the preferred hiring list. It is with this latter administrative treatment that the plaintiffs take issue. (Tr. 6267–70).

Summer hires, with few exceptions, were essentially of a temporary character. It could not be persuasively argued that during a normal period of employment, the seniority provisions of the labor contracts would permit summer hires

to replace employees on layoff. Summer employment was recognized as a program of temporary new additions to the regular labor complement during the school vacation period. While on occasion some temporary summer employees received work assignments to jobs where regular employees were on vacation or absent from work, when the regular employee returned, their prior job awaited them.

In 1960, during the strike, these summer hires were assigned to regular job codes, departments and shifts at regular pay. Regardless of the personnel record treatment of this category of employee, where the Pratt & Whitney Division treated them as "permanent" (Tr. 9570) and Hamilton Division treated them as "temporary," practically all were knowingly identifiable as temporary summer help. In negotiations with the unions during the strike, Burke himself estimated that 800 would return to school in the fall. (Tr. 9552, 8838–39). Thus the Court finds that the summer hires at Pratt & Whitney and Hamilton Standard were temporary replacements. However, this finding is not intended to include those summer hires employed before the commencement of the strike; they were not replacements.

> "Permanent striker replacements who, unknown to employers, were students on summer vacation were not entitled to vote in election, since Board policy is to consider such individuals as temporary employees and to exclude them from bargaining units." Pacific Tile & Porcelain Co., 137 N.L.R.B. 1358, 1364–5, 50 L.R.R.M. 1394, 1397 (1962).

> "College students employed during summer as replacements for regular employees on vacation were not eligible to vote in election under rule of Brown-Forman case, 40 L.R.R.M. 1234, that such employees are temporary or casual employees having no reasonable expectancy of permanent employment. It is immaterial that these employees have signed affidavits indicat-

ing their intention to accept future employment with employer." Belcher Towing Co., 122 N.L.R.B. 121, 43 L.R. R.M. 1248 (1959).

Thus, when they returned to school and their job status was terminated, those job openings became available to the registered strikers on the preferred hiring list, in those instances where the defendant elected to fill the vacancy. If it did fill the vacancy, the defendant did not have the right to exercise a carte blanche choice of transferring into these job openings from within the active complement or alternatively from the preferred hiring list. The defendant admitted that it administered the Agreements by regarding either procedure as permissible within its discretion as a matter of right. The actual number and identity of registered strikers prejudiced by the defendant's not appointing exclusively into this category of hire from the preferred hiring list can best be determined either by stipulation or if necessary, the Court or a Master, appointed by the Court, will be required to hold a supplemental hearing to make findings as to the specific persons affected where unlawful procedures were followed, with attendant provable damages.

## TRAINEES AND APPRENTICES

The term "trainees" is applicable to several categories of employees identifiable by separate prefix numbers. Prefix "72" was a nominal record classification used to identify as a trainee a newly-hired person during the first three weeks of his employment. It is only descriptively used so that a manufacturing department may not have the wages of an inexperienced employee charged against the efficiency of the department to which he is assigned. It is but an accounting designation to free his assigned department for his lack of productivity. (Tr. 6238–39). The treatment of such employees is not in issue and will not be discussed further.

Prefix "73" was applied to a category of short-term trainees to identify them as being assigned to a special training program for a period of two to five weeks. This program was used to train new personnel, who had never been exposed to a machine. It was usually indoctrination in shop math and machine operation. (Tr. 6223, 6294). Prefix "74" was assigned to those who were assigned to an advanced training program requiring 110 weeks of training; (Tr. 5550–5) in 1960, this was curtailed to 98 weeks. These programs were designed to permit an active employee to up-grade his status by special training. (Tr. 6226). A separate and distinct program, prefix "70" was that of "apprentice," (Tr. 6294) which required 6,000 hours training over a period of approximately three years, under an agreement with the company that upon graduation he would be assigned to a skilled job consistent with his special training. (Tr. 5554–57). Short-term and advanced trainees were not part of the bargaining unit. (Tr. 5555).

During the actual strike all of the non-unit trainees and apprentices together with the instructors, were transferred into the shop and assigned duties regularly performed by strikers; the instructors, numbering between 50 and 100, continued on a salaried basis; no change of status slip was processed for the apprentices or the instructors. (Tr. 6206–08). With reasonable promptness at the conclusion of the strike, all the apprentices and instructors were transferred from the jobs they temporarily held during the strike. Within one week after the termination of the strike, the training school was re-established (Tr. 6209) and within a short time thereafter, personnel were transferred back. However, the defendant could not establish with accuracy how many or when all the trainees were transferred back from the bargaining unit into the training program; furthermore, all trainees were not transferred back at one time. (Tr. 6210). During the settlement period, between August 10, 1960 to December 31, 1960, a number of apprentices and trainees were transferred into the bargaining unit as

graduates of these programs. (Tr. 6217). The legal questions raised are whether or not the defendant breached the Settlement Agreements by failing to recall registered strikers to jobs at the end of the strike which were occupied by non-bargaining unit trainees who had been transferred during the strike and by transferring trainees and apprentices upon graduation into the active complement during the settlement period.

The Court in treating this issue, would distinguish those assigned to the training program under prefix "73" and "74" and those assigned to the "apprenticeship program." The apprentice who graduated into the bargaining unit during the settlement period did so without reference to the registered strikers awaiting recall in much the same manner as he would have done had there been no strike. (Tr. 6219–20). He had successfully completed his three-year 6,000-hour program, and obtained a certificate of completion. The company at the commencement of his training had made a commitment to him that he would be assigned to a position in the shop complement in the newly acquired skill, on condition he graduated from the apprenticeship course of training. (Tr. 6220).

Historical precedent in the respective categories of apprentice and trainee also establish a separate and distinct treatment in a layoff situation. Where a layoff occurred, apprentices continued their training and status with the defendant-employer; but a trainee who had come from occupational groups or seniority areas affected by layoffs would be transferred back into that same occupational code and seniority area whence he had come, prior to his assignment into the trainee program. Furthermore, one in the latter category, as distinguished from an apprentice, was subject to layoff along with the rest of the employees in his occupational group and seniority area, if his seniority was such that he would be affected. (Tr. 6220–22). Once the trainee completed his training, the defendant claimed that the labor contract permitted it to transfer a trainee into an occupational group or seniority area even where more senior employees were on layoff. (Tr. 6226–27). The explanation advanced for this preference of the trainee over employees on lay-off status was attributed to the investment which the employer had in their training. However, the defendant insisted that the question was primarily hypothetical and only descriptive of policy, because this actual situation had never arisen. (Tr. 6227–30).

The graduate apprentices, who had acquired their certificates of skill actually possessed a contractual continuity with the defendant from the time of their original entry into the program. The defendant was committed from the beginning to place them in a job opening commensurate with their certified skill. Having fully performed the condition precedent of certification, the defendant was obligated to consummate its three-year commitment, and place the apprentice as it had previously agreed. Such a placement did not constitute a prohibited promotion; nor was it the acquisition of an outside hire in preference to a senior striker on the preferred hiring list under the terms of the Settlement Agreements.

However, trainees in prefix categories "73" and "74" did not enjoy the same status as the apprentices. Their position, even though outside the bargaining unit, was vulnerable to layoff procedures and lacked any firm contractual commitment of placement throughout the training program. Even the defendant confirmed this distinction when it instructed supervisory personnel that non-unit trainees returning to the bargaining unit should be restricted to those seniority areas and occupational groups where there were no senior strikers awaiting recall with the same or a higher labor grade as the trainee. (Tr. 6236–38, 3230–31).

Therefore, where the defendant transferred and promoted trainees into occupational groups and seniority areas during the strike settlement period, where more senior strikers were awaiting re-

call, with the same or a higher labor grade than the trainee assigned to that position, such practice could constitute a promotion to the bargaining unit in violation of the Settlement Agreements. This procedural principle having been established, the individual identity of these trainees must be the subject of proof at a hearing in damages.

 The trainees who were transferred into the active complement during the strike and assigned to jobs usually performed by strikers were clearly temporary replacements for the strikers. Thus, with reasonable promptness the company was obligated to return the strikers to their old jobs in preference over the trainees at the conclusion of the strike. The record does not adequately demonstrate the number or the exact time when the temporary non-bargaining unit trainees were transferred back to the training program after the strike, nor the individual identity of those who remained as temporary employees, thus blocking the return of registered strikers; this too, will be reserved for the aforesaid supplemental hearing.

## BREACH OF ORAL AGREEMENT

The plaintiff-unions and the defendant had reached an agreement prior to the July 23, 1960 union membership meeting; the essential elements were embodied in plaintiffs' Exhibits 311 and 312; and also referred to in defendant's Exhibit 75, p. 3. Several of the controversial issues referred to in these proposed settlement terms were: (1) All officers and committeemen will have a job (PX–311 and PX–312, p. 5); (2) the preferred hiring list would extend for six months (the exact wordage was that it would continue until January 23, 1961 (PX–311, PX–312, p. 6)); (3) the company would offer unrecalled strikers jobs in occupational groups and seniority areas other than those they had been in before the strike, provided they were qualified and no strikers from these groups and areas were awaiting recall; (4) the company agreed to recall strikers whose former jobs were filled to "available jobs." (PX–311 and PX–312, p. 6, items #4 and #5).

However, on July 23, 1960, the membership of Pratt & Whitney Lodge #1746 soundly defeated ratification of the terms of this proposed settlement by a vote approximately 3,800 to 300. At this point all pending understandings between the parties were terminated. Negotiations were not renewed again until the informal conference called by the Governor at the Park Lane Hotel in New York City on August 5, 1960.

The unions' general counsel, Papps, claimed that at that meeting he took out of his pocket a copy of the previous strike settlement agreement, which had been voted down by the union on July 23, 1960, handed it to Burke and inquired whether or not this was the "package;" the latter, Papps claims, responded affirmatively and kept the copy. (Tr. 8842–43, 8976). Burke denies this vehemently and states that this incident never happened. (Tr. 9518).

A review of the memorandum prepared three days later, August 8, 1960, by the International Union President Hayes, which purportedly summarized the areas of agreement at the conference, does not support the plaintiffs' claims that the unions' representatives understood that all of the terms in the defeated proposal of July 23, 1960 were considered to be incorporated in the alleged oral agreement of August 5, 1960. (DX–76). Furthermore, it should be noted that when plaintiffs' Exhibit 312 was offered at a National Labor Relations Board hearing on June 19, 1964, Papps could not recall having seen it before and was unable to identify it. In fact, he stated that he thought it had been typed and copied subsequent to the July 23, 1960 membership meeting. (Tr. 8970–71). He also indicated that his powers of recall were not always dependable. (Tr. 8958, 8972). This failure of accurate recollection in this respect was accentuated further by his correction of an error in an affidavit previously submitted in a National Labor Relations Board proceeding. (Tr. 8867–70).

President Hayes was in regular communication by telephone with the local lodge officials throughout the conference at the Park Lane in New York, advising and discussing with them on what had been agreed to; and Papps was in the same room with him at least part of the time listening to Hayes' conversation. Despite the significance of the contents of plaintiffs' Exhibit 312, Papps could not recalled having heard Hayes tell the local lodge officials, that the substance of the agreements in plaintiffs' Exhibit 312 had been mutually agreed upon and would constitute the basis of the proposed settlement. (Tr. 8979).

There was further controversy over whose responsibility it was to draw the final settlement agreements. The plaintiffs claimed that both legal counsel were to get together and do it; while the defendant suggested that counsel's responsibility was limited to the drawing of the arbitration submission covering the strike misconduct cases. In any event, a proposed settlement contract was prepared by Mooney, the defendant's personnel manager, and it was subsequently executed by both parties after a discussion of its terms, on August 16, 1960. Present at this final session were not only the local lodge officers, but Grand Lodge Representative Thurer, an experienced union negotiator, who had been an active participant and consultant with the local lodge bargaining committees throughout the negotiations. He acted as liaison agent for the International and was a signator on all of the settlement agreements. He was experienced and competent to pass upon and expertly advise the local committees. While both parties were represented by counsel, neither party had counsel present when the agreements were finally discussed and executed. (Tr. 931-32).

General Counsel Papps claimed that he had not been consulted on the form of the final draft (Tr. 8848) and had not seen it prior to its execution. Burke denied that he ever represented at the August 11, 1960 meeting prior to the signing, that plaintiffs' general counsel,

Papps, had a copy of the agreement on his desk. (Tr. 9529-30). However, eight days later, on August 24, 1960, counsel for both parties signed the arbitration submission. (DX-16). This latter agreement recited that it incorporated Exhibits "A", "B" and "C"; "A" was the Pratt & Whitney Settlement Agreement; "B" was the Hamilton Settlement Agreement and "C" was a list of the 50 strikers whose cases were subject to arbitration. Papps claimed that although he signed the original and initialed his own copy, (DX-77) the agreement had affixed to it only Exhibit "C" and defendant's counsel was supposed to mail him Exhibits "A" and "B". (Tr. 8980-86). Papps did admit that he had seen both settlement agreements at the time of the meeting on September 21, 1960, and he had not at that time made any complaint that the contract did not conform with what he and Burke had agreed. (Tr. 8852, 9531).

In evaluating the merits of each of the plaintiffs' representations, that the terms of the July 23, 1960 agreement should have been incorporated in the written settlement, it seems worthy of note, that at no time did the unions contend that past labor practices warranted union officers or officials being entitled to any recall preference. (Tr. 4843). Fraser, the Pratt & Whitney Union President, who held nine years seniority (Tr. 5848), had been on a leave of absence which terminated June 6, 1960 after the defendant refused to consent to its extension. (Tr. 5845-46). It was subsequently agreed that he would be permitted nevertheless to register as a striker. (Tr. 5907). This raised the question as to whether or not he was entitled to recall preference, because of his being a union officer. He was reminded by Morse that the August 16, 1960 contract did not so provide; he responded that he was "just trying." (Tr. 5924). No further issue or grievance was raised on this point, by him or in behalf of any of the other union officers. Had the claim had any substance, in all likelihood, it would not have been passed over so

lightly. Furthermore, it is especially significant that when the plaintiffs filed charges of unfair labor practices against the defendant in November 1960, no issue was raised then concerning the defendant's failure or refusal to recall union officers and committeemen. Certainly, if there was any merit to the claim, it would have been complained of at that time. (Tr. 9023–27).

The July 23, 1960 agreement also provided that the preferred hiring list would extend for six months to January 23, 1961. This concept had its origin in the labor contract, which provided that an employee with less than six years seniority had recall rights for six months; those with over six years seniority had recall rights of one year. After the recall limitation expired, any such employee thereafter rehired had no seniority status; he was in the category of a new hire. At the August 6, 1960 meeting with Thurer, Main and Fraser, when the local union officers were reviewing what had been agreed to the previous day in New York, Burke advised them that after December 31, 1960, the procedure applicable to the preferred hiring list would not be followed; (Tr. 3006) this point was clearly understood and agreed to before the union called the membership ratification meeting.

As outlined in an earlier part of the opinion, the parties discussed the terms of the Strike Settlement Agreements in detail and Burke accepted a change in paragraph 4(b) of the Hamilton contract, suggested by Grand Lodge Representative Thurer, to permit recall to a "comparable job." (see *supra*). The change in paragraph 4(b) of the Hamilton agreement was mutually assented to and the final drafts of both contracts were executed on August 16, 1960.

The Court finds that the plaintiffs have wholly failed to prove that there was any oral agreement whose terms varied from those embodied in the Strike Settlement Agreements as finally executed. Furthermore, even had there been such an oral agreement, the written Settlement Contracts became the repository of all antecedent oral understandings of the parties. These prior discussions were merged into the written contracts. It is especially important in the field of labor relations, where bargaining committees and varied groups of individuals are involved, that a dependable policy which encourages reliance on objective written documents and outlaws subjective impressions should not only be encouraged, but adopted. 4 Williston § 631 (3d Ed. 1961).

## PREFERRED HIRING LIST

Both Strike Settlement Agreements provided in paragraph 4(c) that registered strikers for whom no job was available in accordance with paragraphs 4(a) and 4(b) would be placed on a preferred hiring list; and they would be recalled to job openings which developed prior to January 1, 1961, before new employees were hired. The priority of recall to these job openings at Pratt & Whitney was in accordance with their seniority under Article VII, Sections 1 and 2 of the labor contract and at Hamilton, in accordance with the principles of seniority and demonstrated ability under similar contract provisions. Preferred hiring list disputes were not subject to the regular grievance procedures under the labor contract. They were dealt with through a special procedure agreed to by the parties, wherein the issues would be reviewed with the division personnel manager with right of appeal to Personnel Director Mooney. (Tr. 4859–64).

. As previously explained, when recall had been completed at Pratt & Whitney under paragraphs 4(a) and 4(b), the residual registered strikers constituted the preferred hiring list (Tr. 530, 544–45) and a change of status slip was made transferring said strikers to a nominal "plant 90" for purposes of records control. (Tr. 534–36, DX–46). It was kept current by removing the names of those who terminated, because of resignation, death, retirement, discharge after arbitration or failure to answer recall. "Plant 90" was the reservoir from which

the defendant recalled strikers before new employees were hired from the outside. At Hamilton the process was the same, except nominal "plant 800" was used for Windsor Locks strikers and nominal "plant 900" for Broad Brook (Tr. 534–36); and the actual registration cards were used rather than the change of status slip. (Tr. 4949–50).

A listing of registered strikers similar to a layoff listing by job code and department was first prepared upon conclusion of registration, so that strikers could be returned to their identical jobs under 4(a). Following the first listing, a list of all the registered strikers, including those on the first listing, was arranged by occupational group and seniority area and was prepared to administer paragraphs 4(b) and 4(c) of the Settlement Agreements. (Tr. 5486–90, PX–109).

The plaintiffs claim that the defendant breached the settlement contracts, because no actual piece of paper containing a list or column of names in order of seniority, by seniority area and occupational code was prepared, so as to establish a preferred hiring list as the contract required. Plaintiffs claim that when there was a layoff, the company traditionally and historically prepared layoff lists and that these were made available for the plaintiffs to see. (Tr. 243). The defendant on the other hand represents that the original striker registration cards and the change of status slips which were kept current, constituted in fact the most functional preferred hiring list for administrative purposes. (Tr. 214, 4874–75, 9595–96). The plaintiffs, for the first time, became aware of the type of listing being used, at an arbitration panel hearing concerning cases related to strikers' misconduct during the strike. (Tr. 894).

Ordinarily when there was a layoff, the Data Processing Department was called upon to prepare a special runoff list dealing with seniority areas and occupational groups. (Tr. 4872). The information contained thereon, relative to those who were to be laid off or retained

was usually reviewed with the chairman of the unions' shop committee in the personnel office; and while he was never given a copy outright he was invited to come in and to transcribe the essential data therefrom.

When the unions requested a listing of the employees still awaiting recall from the preferred hiring lists (Tr. 6130), the defendant refused to prepare it and instead invited the plaintiffs, as was the custom, to send their representatives to the personnel office to get the required information from the master personnel records. Morse represented that had the unions accepted the defendant's offer, at Hamilton they could have promptly transposed the essential data from the company's record cards to their own original listing of registered strikers; and at Pratt & Whitney they could have similarly transcribed it to their own copy of the original registration cards previously given to them by the defendant. The unions adamantly refused to visit the defendant's personnel offices to procure these listings, claiming they were under no obligation to do so. Thè impasse on the exchange of this information followed.

The defendant customarily furnished the plaintiffs with all the factual data which the labor contract required; the detailed job classification sheets (Art. VI, Section 12); the quarterly records with the names of those who had received a base rate increase as a result of performance rating; and a semi-annual listing showing the seniority of the employees. (PX–95, Art. VI, § 15, Art. VII, § 4; PX–93, Art. VI, § 15, Art. VII, § 6).

Under the previous collective bargaining agreements, (PX–92, Art. VII, § 6, p. 21, PX–94, Art. VII, § 5, p. 23) the unions had received a seniority listing showing in order number, the clock number, the names of employees, date of hire, seniority code (weeks of seniority) and the department. (PX–21, 2(d), PX–22 (3–53), PX–22 (3–54)). The most recent seniority listing prior to August 11, 1960 at Pratt & Whitney was August 1959, because a new contract had not

been consummated; and at Hamilton the most recent seniority listing was in January 1960. The next such listings under the terms of the new labor contracts of August 16, 1960, were to be provided in February 1961. (Tr. 1480). At the time of the original registration of the strikers in Lodge #743, a list was compiled showing the name and clock number of each. (PX–163, PX–22(1), pp. 48–49; Tr. 1721–22, 1726–27, 1740, 1840–44, 3311–12). Similarly, Pratt & Whitney furnished to Lodge #1746 a data processed list of registered strikers, showing name and clock number. (PX–160, Tr. 5478, 898–903, 1437–38, 1914, 8996).

The necessary factual information sought by the unions was not denied to them. Had they sent competent people to the personnel office to procure this information, as the defendant had repeatedly invited them to do and as was the custom on a layoff, the records were not so complex, but that adequate information to police the Agreements could have been readily and promptly obtained in respect to the preferred hiring lists without unreasonable expense. For the plaintiffs to adamantly sit back, make no effort and refuse to do anything to obtain the information through their own efforts and expect the defendant to supply it solely through company effort and at company expense was not responsible union conduct. Had the plaintiffs sought out the information at the personnel office and the defendant then showed lack of cooperation, evasive conduct, or an intent to frustrate a reasonable disclosure, the plaintiffs could then with some justification make claim to the defendant's bad faith in administering the Settlement Agreements. The Court finds that a practical and functional preferred hiring list existed by the use of the registration card method and it was in fact regularly maintained by the defendant in the administration of these contracts; the defendant was not guilty of wilful concealment or other unlawful conduct in respect thereto.

## DISCLOSURE OF RECORDS

The plaintiffs vigorously challenge the defendant's exercise of good faith and fair dealing in its performance of the Strike Settlement Agreements. One aspect of their claims is based upon the theory that the defendant deliberately concealed business records from the plaintiffs and refused to disclose data essential to the latter's effectively policing the Strike Settlement Agreements. (Tr. 947, 1014). Having already treated the preferred hiring list issue, that phase of the case will not be repeated here.

The parties' controversy over the disclosure of records began some years before the strike. From 1953 through 1960, the defendant had negotiated several collective bargaining agreements with the plaintiff-unions. During this period, the unions claim they were not aware of the existence of a bi-weekly runoff list (PX–21(a) (c)) containing detailed data on seniority, which if known by the plaintiffs would have been of assistance to them in policing the contracts. (Tr. 871–73). Plaintiffs represent that the existence of such a so-called seniority list at Pratt & Whitney came to their attention on September 10, 1963 (Tr. 927) in Coward's deposition; and in respect to Hamilton on October 24, 1963 in Vandervoort's deposition (Tr. 1897). The first time they claim to have seen them was in February 1964. (Tr. 435).

Coward, a programmer and analyst in Personnel, stated that her best recollection was that she had helped prepare the bi-weekly runoff lists since 1958. (Tr. 1298). They contained the job codes of both the bargaining unit employees and non-bargaining unit employees. (Tr. 439, 1309). Before the lists could have been given to the unions, non-bargaining unit employees would have had to have been excluded, a task requiring extra work of a day or so. Furthermore, the company asserted that the lists could have been of value to the unions only if they were arranged by occupational codes within seniority areas, so as to show the

relative seniority of all the bargaining people within those occupational groups and seniority areas; it might have taken two to three weeks additional work to so rearrange them. The number of personnel required does not appear in the record. (Tr. 1319–22).

Plaintiffs' witnesses stated that as early as 1951, they had learned of a data process runoff similar to plaintiffs' Exhibit 21(2) (d), (the seniority lists given to the unions every six months by the company), but which contained more information. (PX–162; Tr. 1486, 1499). The defendant explained that this data was specifically sent in reply to a special request on August 10, 1950, (DX–8, Tr. 2971–75) by the then president of the union, who sought a list of all employees in each unit, by department, clock number, classification, labor grade, hourly rate and merit rating, together with changes which occurred between June 1, 1949 and June 1, 1950. (Tr. 3046–55). The union's Financial Secretary Danahy recalled having such a list similar to plaintiffs' Exhibit 162, but could not recall whether or not it was in response to this specific request. (PX–162, DX–8; tr. 1936, 1940–45). The union denied that it was specifically sent and claimed that at a subsequent grievance hearing when it was mentioned by the union representative, Korper, an assistant to the superintendent at that time, responded that it had been given out in error and would not be available again. (Tr. 1499).

The defendant represented that these regular runoff lists (PX–21(2) (c)) were departmentalized while plaintiffs' Exhibit 21(2) (d) was not. However, as long as the person seeking the information obtained the clock number of the employee, the seniority data sought could easily be obtained from plaintiffs' Exhibit 21(2) (d). (Tr. 1522-3, 1573). The bi-weekly runoffs were treated by the defendant as routine work papers for the wage and salary division (Tr. 425–431) which was required to check merit rating classifications. (Tr. 435–38). Personnel Director Mooney represented that he himself was not aware of the

existence of such a bi-weekly runoff at Pratt & Whitney or Hamilton until the issue was raised in the current Labor Board case and in this proceeding. (Tr. 3058–59).

There had been a continuing controversy over the years as to whether the union should bear the cost of furnishing or maintaining records which the union claimed it required. (Tr. 1599). In fact, as early as September 11, 1953, Lodge #1746 had requested detailed information and when the request was resisted, charges were filed with the NLRB and the Regional Director refused to issue a complaint. An appeal was filed, but it was voluntarily withdrawn by the union before it was acted upon. (PX–67; Tr. 1834, 2977–78). In 1955, detailed information was requested again (PX–73, PX–74; Tr. 1830–31), which was refused by the defendant. However, throughout the exchange of correspondence, the defendant offered and held open and available to the unions the open scrutiny of all of its own basic personnel records. A condition was that the unions' inspection and analysis of these records should be done in the defendant's offices. (PX–69–72, PX–74). In fact, after the unions requested certain information on May 27, 1955 (PX–68), they did send representatives to defendant's personnel office to review the records and transcribe information. No complaint was made as to the effectiveness of the project. (Tr. 5449–51). In 1958, the unions again inspected and analyzed certain basic personnel records to procure relevant data. (DX–41, DX–42; Tr. 5461–64).

Throughout their course of dealings, this latter procedure was recognized in practice. On January 1, 1959, when 600 employees were laid off at Hamilton, Seedman, the President and Shop Committee chairman, went to the plant on that day and copied the proposed layoff list and supporting data and discussed the propriety of retentions with a personnel officer. (Tr. 1745). Similarly, when Cope reviewed the layoff list at Pratt & Whitney, he went into defend-

ant's personnel department to copy it. (Tr. 1477). As far back as September 1955, the union had sent four employees into the plant offices at Pratt & Whitney to make a survey of the employees by name, clock number, weeks of seniority, department, occupational code, last raise, labor grade, classification, job rate, and last merit increase and amount. (Tr. 1354–58). The assigned personnel were generally untrained to do that work; and Hislop explained that she quit after one week because there was too much talking and a waste of time. (Tr. 1367, 1385–86). The information was never used. (Tr. 1388).

It is significant to note that throughout the decade preceding the strike, several contracts were negotiated between the parties, wherein it was agreed that certain specific information would be provided to the union at defendant's expense:

| | | |
|---|---|---|
| (1) Wage check-off. | Art. IV, §§1, 5 | – P&W |
| | Art. IV | – Hamilton |
| (2) Seniority list of employees furnished to union each 6 months in January or February and during the summer. (PX–21(2) (d)). (Tr. 1609). | Art. VII, §6 | – P&W |
| | Art. VII, §4 | – Hamilton |
| (3) Detailed job description sheets covering new or changed hourly-rated jobs, within 30 days following approval of such jobs. | Art. VI, §12 | – P&W |
| | Art. VI, §12 | – Hamilton |
| (4) A quarterly record of those in prior calendar quarter who received an increase in the base rate as the result of a performance rating. These shall include department number, job code, previous base rate and rating of employees. (Tr. 1585–86). | Art. VI, §15 | – P&W |
| | Art. VI, §15 | – Hamilton |
| (5) Layoff lists. | Art. VII, §5 | – P&W |
| | Art. VII, §3 | – Hamilton |

—◆—

There appears to be no quarrel with the fact that this data was satisfactorily furnished in keeping with the labor contracts. During 1960, after the strike, the defendant took the unions' fifty volume files of job description sheets, which had been poorly kept up by union office personnel and brought the records up to date. (Tr. 1603–05).

The plaintiffs claim that the defendant should have made available to them the bi-weekly runoff lists containing detailed data on seniority during the settlement period. They represented that the regular labor contract seniority list (PX–21(2) (d)) which was prepared every six months was the only seniority roster available to them. It had been last prepared before the strike in the summer of 1959 and the plaintiffs report that it was obsolete and useless to them in administering the Settlement Agreements. The new one did not become available until February 1961 under the terms of the 1960 collective bargaining agreements. (Tr. 1480).

On October 13, 1960, Lodge #1746 and Lodge #743 simultaneously requested of the defendant, certain personnel data (PX–75, PX–76) relating to the admin-

istration of the Settlement Agreements. The defendant responded on October 21, 1960 to each (PX–77, PX–78) advising the plaintiffs that the registered striker lists were already in their possession and that no formal listing of the specific information sought was maintained by the defendant-company. It invited the plaintiffs to inspect and analyze the personnel records kept by the company so that they themselves might compile the specific information sought. The plaintiff unions instead responded by reiterating their requests for detailed information in a successive series of correspondence. (PX–79–91; Tr. 895–99, 909–14). The defendant's reply to each was substantially the same. It repeated the absence of a formal business record, which would give the specific detailed information sought and invited the plaintiffs to examine the appropriate basic personnel records at defendant's office to procure the information. (Tr. 904, 3907).

Defendant's data processing analyst, Justus Littel, who supervised a department of 275 employees, expressed the opinion that the available runoff lists on October 13, 1960 would only give the information as to what jobs were filled and by whom as of the day they were run; it would not historically disclose whether or not they were the same jobs they had occupied four or five months earlier. This information could be obtained by putting the data on punch cards at considerable expense. (Tr. 1265–68). Programmer and analyst Coward explained that the information requested in plaintiffs' Exhibit 75 could not be furnished by the defendant from the IBM electronic system in effect prior to May 1961, unless the cards were specifically punched for that purpose. She stated that this would be a formidable job. (Tr. 1328–32).

She explained further that to inquire about and tabulate 4,500 employees out of the 16,000 total complement, one would have to know the statistical data on all the other people. In order to ask the machine who the replacement was, you would have to give the machine information concerning all the employees, so that the machine could test each one of them, to see who was on the job. To know who were returned to their original jobs, you would have to know the original job on June 7, 1960. She stated that she had never done a job in such volume; and it was her opinion that it would be too formidable a task for defendant to do. She stated that a project of such magnitude would be sent to some one outside the plant to do. (Tr. 1340, 1010). At all times during this letter writing exchange between the parties, the defendant expressed its willingness to provide the information, if the plaintiff would be willing to pay the cost. (Tr. 1575).

The plaintiffs' position is that the employer is obligated by law to furnish to the unions without charge, the best document regularly kept by it and available for use in policing the contracts and Strike Settlement Agreements. (Tr. 933). In this regard they place special emphasis on the bi-weekly runoff lists. Their position is that if they had been furnished the preferred hiring list plus the bi-weekly seniority list, it might have been adequate. (Tr. 934–35). The labor contract, executed five days after the Settlement Agreements, contains precisely the same provisions relating to the furnishing of lists, including layoff lists, as was provided in the prior labor agreements extending back over a period of years. (Tr. 930). The defendant-employer takes the position that the information lists, which were required to be furnished by the defendant, have been specifically provided for in the contract; and the detailed information now sought was not within its provisions.

This issue between the parties has been continually present in their dealings throughout the past decade (DX–8; Tr. 1599–1601, 2971); but not until their relations became acutely inflamed by the animosities engendered by the strike, did it become a matter for court litigation. It is presently pending in this Court in a separate civil action, in which the National Labor Relations Board is seeking an injunction against the defendant,

pursuant to § 10(j) of the NLRA, 29 U.S.C. § 160(j). The plaintiff-unions filed the complaint with the Board on November 21, 1960, but judicial remedial action was not commenced until July 2, 1964; Civil Action No. 10,535, Albert J. Hoban, Regional Director, NLRB v. United Aircraft Corporation (Pratt & Whitney Division and Hamilton Standard Division). A hearing on the merits was deferred by stipulation of the parties, so that the issues in this trial might first be concluded; but in no event should the delay extend beyond September 11, 1969. The stipulation provided that the plaintiff-unions post substantial indemnity bonds guaranteeing the defendant reimbursement for the additional expense should the Court ultimately find that the law did not obligate the defendants to voluntarily furnish this service at its own expense. Both litigants have remained adamant in their respective positions on this issue.

During the strike settlement period, the plaintiffs made no attempt to inspect or analyze the defendant's basic personnel records, despite the fact that the opportunity had been repeatedly offered to them. Had a reasonable attempt been made to inspect the master wage and salary card records and other relevant data and had experience demonstrated the futility of the effort due to the absence or inadequacy of records, or had the defendant by active or passive wilful conduct frustrated the plaintiffs' efforts, then the latter's present claim that the defendant acted in bad faith might take on a ring of substance. The bare request that statistical information be compiled by the employer and delivered to the unions, when met by the defendant's refusal under color of right, fails to satisfy the requirements of responsible union representation, especially where reasonable alternative sources of information are voluntarily offered.

Lodge #1746 alone had 6,500 dues-paying members at $4.00 per month (present monthly dues are $5.00) prior to the strike (Tr. 1547, 1643); the major part of these dues were regularly withheld out of wages by the employer and turned over to the union monthly pursuant to the terms of the labor contract. There was no apparent reason why professional personnel retained by the plaintiffs could not have analyzed the defendant's pertinent personnel records during this brief period. The IAM parent International Union which received one-half the membership dues was mechanically equipped to screen the analysis through its own computer equipment. They now have a Univac III large scale data processing and computer system; and prior to the present system, they used a Sperry-Rand Univac. (Tr. 8568–69). It was conceded that the capacity of their computer equipment was available, but they were short of manpower. (Tr. 8570). Instead the union did nothing; it sat back and claimed that the defendant's position was evidence of its bad faith.

The legal obligation to furnish these records which the defendant categorizes as its "work papers" (Tr. 425–26) has never been resolved; it cannot be inferred that the defendant acted in bad faith, where there is colorable merit the defendant's stand in offering to make the records available for copying, but not furnishing the analyzed information on demand. The Court finds, that insofar as the performance of the Strike Settlement Agreements is concerned, it cannot be inferred as a matter of law that the defendant, by its refusal to provide the records requested, is thereby guilty of bad faith in administering the Settlement Agreements. All relevant records were offered to be made available to the plaintiffs; the latters' own inertia was a compelling factor in their failure to procure them.

### UNION OFFICIALS

During the trial the Court expressed an interest in the defendant's post-strike treatment of the officers in both unions. Detailed statistics demonstrating the respective points of view of the litigants

were submitted. The plaintiffs' claims are tabulated in plaintiffs' Exhibits 269 through 280, 285, and 286.

The defendant's analysis in respect to defendant's treatment of union officials is summarized in defendant's Exhibits 67, 52 and 52(A) (B) (C) (D); and it demonstrated the period from August 15, 1960 through May 1, 1961. This is further supplemented by defendant's Exhibit 51 which reveals statistics relating to unrecalled strikers on the preferred hiring list on December 31, 1960, as well as those who were subsequently hired back from that date through November 15, 1966.

The plaintiffs advance as an indicia of proof of bad faith and discrimination, that a larger percentage of union officials were not returned to work compared with the total number of registered strikers generally. (PX–285, PX–286).

| Returned by 1/1/61 | Pratt & Whitney | Hamilton |
|---|---|---|
| Registered strikers | 76.3% | 53.3% |
| Officers | 62.5% | 30.0% |
| Committeemen | 50.0% | 16.7% |
| Stewards | 68.4% | 48.0% |

The modest variance at Pratt & Whitney between stewards and registered strikers or union officers and registered strikers is certainly not persuasive; no adverse inference from such statistics can be drawn against the defendant. Furthermore, selection to these union positions is a variable to which uniform averages cannot apply. A parallel finding is applicable at Hamilton, where the registered strikers' failure of recall was comparatively much deeper. It is also significant in considering the unions' accusation of company animus that although there were union officials among those charged with strike misconduct, the defendant agreed to omit those names from the list of 50, solely because of their union position. (Tr. 9010, 9028, 9034).

At Pratt & Whitney 72 of the union officials in Lodge #1746 registered to return to work at the end of the strike, out of a total of 83 who had held the major offices.[16] This latter group included the offices of president, vice-president, secretary-treasurer, trustees, sentinel, committeemen and stewards.

Four of these had their alleged strike misconduct submitted to the arbitration panel and of these, two were dismissed for cause after hearing and the remaining two voluntarily withdrew their cases from arbitration and thus became ineligible. Out of a total of 68 union officials, 43 were recalled during the settlement period, and two resigned during that period, thus leaving 23 on the preferred hiring list. During 1961, seven of this number failed to respond to defendant's written invitation to seek employment and of the 16 who did apply during the first four months of 1961, six were hired; and in June 1961 a seventh. During this period five union officials refused job offers. A substantial number of those who were recalled, received promotions and merit increases.

At Hamilton 41 of the 42 union officials in Lodge #1746 registered to return to work. Of this number 16 were returned during the settlement period to substantially the same job; included in this number were the president, vice-president, and recording secretary of the

16. Steward, the Vice-President, transferred to another plant prior to the strike; Dooley, a steward, never went out on strike; Guyette and Moquin, stewards, returned to work before the strike ended; Aarons, Lander, Messenger, Mikelis, Paulson and Wholey, all stewards, resigned and did not register to return; Danahy, the financial secretary, was not an employee. See DX–52(D).

union. There was one additional union official appointed to a lesser job; and ten were subsequently promoted or received merit increases. Twenty-three remained on the preferred hiring list on December 31, 1960, one steward having resigned on August 16, 1960. During 1961, eight failed to respond to defendant's written invitation to seek further employment with the company. Of the remaining 15 union officials who did apply in 1961, three were offered employment, one failed to report and one failed to meet the physical examination.

Seedman, Union President at Hamilton, stated that he knew of no persons who were not hired during January, February, and March 1961, because of discrimination against them or against the union as such. (Tr. 1882, 1910).

A few cases require the Court's special attention and among them was Fraser, the President of Lodge #1746. He had been on a leave of absence prior to the strike, by consent of the defendant, and the latter declined to renew this leave on June 6, 1960. (PX–222). Subsequently, it was mutually agreed that he could register with the others as a striker and thus become eligible to benefit from the terms of the recall agreement. (Tr. 5906–07, 5846–47). The plaintiffs claim that since he was in a toolmaker's classification (PX–230) and such skills were already in great demand, he had been discriminated against due to his union officer's position and his active participation in the strike.

A review of his employment status is contained in defendant's Exhibits 68, 60, and 60A. His job was in department #96, seniority area 9, in occupational code #500; and his job code was 475.5, job grade #4. The Pratt & Whitney labor contract and Settlement Agreement provided that he was entitled to be recalled by noninterchangeable occupational group within his specified seniority area and in accordance with seniority, before new employers were hired. His occupational code, or family of jobs, included job code 495.1, grade #2, 475.5 grade #4, and 495.2, grade #6. In other

seniority areas or occupational codes, Fraser had no rights which were superior because of his seniority to someone who did have rights in that seniority area and occupational group. (PX–93; Tr. 6549–50). The seniority area in this instance was merely department #96; so his rights would be in this department. Plaintiffs' counsel conceded that this was probably true. (Tr. 6551). This is a semi-production department, not in the mainstream of the manufacturing operations. It is where limited prototype work is done and errors corrected before mass production. (Tr. 6566). The complement on June 7, 1960 was 11; at the end of the strike there were eight. On October 1, 1960, the active complement in his job category was reduced to 7, but no new employee was added, at least through May 1, 1961. On March 4, 1961, Fraser was offered and accepted employment in D–96 in a grade 5 job in occupational code 110; but on March 7, 1961, he called in and said he would not report. Morse denied that there was ever any discussion about Fraser being next in seniority and for that reason defendant would withhold hiring. (Tr. 7022–23). From these facts, the Court finds that the plaintiffs have not proven by a fair preponderance of the evidence that the defendant discriminated against this union officer or acted in bad faith toward him in the performance of the labor contract and Settlement Agreements.

The plaintiffs claim that the defendant was discriminatorily motivated against an employee named Lyons in that it did not recall him prior to January 1, 1961. Lyons was originally hired by Hamilton on February 19, 1945. At the time of the strike, he was a trustee and shop committeeman for the union and served as chairman of its Welfare Committee during the strike period. (Tr. 4380). At the time of his original hiring, a workman's compensation waiver containing the restriction "avoid excessive strenuous use of left arm" was accepted from him by the defendant; (PX–220(A), (B), (C), (D)); it noted that he had a

residual atrophy of the left arm and right leg, an aftermath of poliomyelitis. His original job in 1945 was as an assembler and disassembler, (Tr. 4718–19) job code 15–4 labor grade 7, and he progressed through the years to the position of setup or leadman, labor grade #3, job code 131, in department 15, a job tantamount to a straw boss, so-called. On January 17, 1961, he accepted a job in labor grade 7, job code 152, department 15, but after a physical examination by the plant physician, it was determined that he could not safely meet the physical functional demands of the job. (PX–209(A), (B); Tr. 4721–22, 7336–38). The plaintiffs claim this was motivated by the defendant's continued animus, since Lyons previously had this physical condition when he was originally hired and that it had become no worse. (Tr. 7350–54). However, the physical demands of a set-up man were substantially less than the job he would have been called upon to perform in January 1961. (PX–209, PX–235(A–F); Tr. 7338). Lyons was not examined by his own doctor after the defendant's physician turned him down. The Court accepts the objective findings of the defendant's trained medical officer. The defendant's action in denying Lyons employment at that time did not establish the plaintiffs' claim that the defendant had avoided Lyons' recall during the contract period prior to January 1, 1961, because it was motivated by animus arising from his union activity.

A third union officer, Lasch, who was steward trustee and a picket captain was not recalled; and the plaintiffs point to the fact that he was the only man on the first shift in his job code who did not get back during 1960. (Tr. 8007). He feels that because of his union activity and because he announced the commencement of the strike in his department and asked others to follow, the defendant retaliated by discriminating against him. His work was that of a tool and die maker "B", job code 436.1, labor grade 4 in experimental. While the plaintiffs do not contend that defendant departed from the technical terms of the contract in the order of recall (Tr. 8048), they asked the Court to infer animus and discrimination by the defendant against him, because the defendant claimed that no jobs were available when his seniority position was reached (Tr. 8009); and if no job was available, defendant should have offered him one in some other department. (Tr. 6530). The defendant did write to him January 27, 1961 asking him to reapply, but he declined. While the person involved would naturally have suspicion of animus, there is not sufficient evidence before the Court to find that it has been proven.

▆▆▆ Having examined the exhibits relating to all the union officials referred to by both parties, and after weighing the plaintiffs' claims and suspicions with the countervailing evidence offered by the defendant, describing the status and treatment of all union officials during the settlement period and thereafter, the Court finds that the plaintiffs' evidence is insufficient to sustain their claimed inference, that the defendant discriminated against union officials.

## CONCLUSION

In the light of the Court's findings, it is suggested that counsel confer and agree to stipulate to the identity of individual registered strikers on the preferred hiring list, who are affected by these findings. In those instances where agreement cannot be reached, a supplemental hearing will be held by the Court or a Master appointed by the Court, to ascertain the identity of such persons preparatory to the assessment of provable damages. This stipulation should include the following factual data:

1. Vacancies caused by the termination of summer hires during the settlement period (except those summer hires employed before the commencement of the strike), which were filled from a source other than the preferred hiring list, at a time when senior registered strikers in the same seniority area and

occupational group were still awaiting recall; together with the identity of those persons prejudiced thereby.

2. Vacancies which were filled by promotions within the same seniority area, where registered strikers on the preferred hiring list, senior to the promotee, were still awaiting recall; and the identity of persons prejudiced thereby.

3. Vacancies which were filled by the promotion of trainees into seniority areas in the bargaining unit, where senior registered strikers were still awaiting recall; and the identity of any strikers prejudiced by the retention of temporary trainees after the settlement agreements became effective.

4. The identity of those registered strikers who executed waivers to await recall to their former job, which was ultimately filled by the transfer of a less senior employee within the active complement.

5. Vacancies which were filled by transfer across occupational code and seniority area lines during the strike settlement period, where more senior registered strikers on the preferred hiring list were still awaiting recall.

The Court finds that except in these limited areas where it found specific contractual violations, the defendant exercised good faith in its overall performance of the Strike Settlement Agreements. To conclude otherwise, would require multiple strained, speculative and unjustifiable inferences.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court pursuant to Rule 52(a), Fed.R.Civ.P.

## ADDENDUM TO MEMORANDUM OF DECISION

By stipulation of counsel in consolidated Civil Actions No. 9084 and No. 9085, dated May 27, 1969, approved and ordered by the Court as of said date, the original Memorandum of Decision is amended and clarified as follows:

"Prefix '73' trainees, i. e., 'short term trainees' were part of the bargaining unit (just as were Prefix '72' trainees) and accordingly the treatment of neither of these two groups of employees is in issue or need be discussed further (pp. —— — ——) in said Memorandum of Decision."

"In the section captioned 'Conclusion' (pp. —— – ——)—the fact that the contractual seniority groupings at Pratt & Whitney and those at Hamilton differed in that, at Pratt & Whitney, the groupings consisted of employees in noninterchangeable occupational codes within each seniority area, whereas, at Hamilton Standard, the groupings consisted of the employees in each of the seniority areas—occupational codes at Hamilton being of no particular significance with respect to seniority—and recall rights at Hamilton, therefore, being to jobs in the employee's pre-strike seniority area (of his pre-strike or lower paid labor grade) for which he had (demonstrated ability' as defined at page —— of the Memorandum of Decision."

Amendment so ordered.